# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP1240 |
| COMPLETE TITLE: | John McAdams, |
| |       Plaintiff-Appellant, |
| |   v. |
| | Marquette University, |
| |       Defendant-Respondent. |

ON BYPASS FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 6, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 19, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | David A. Hansher |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | R.G. BRADLEY, J., concurs (opinion filed). KELLY, J., concurs, joined by R.G. BRADLEY, J. (opinion filed). |
| DISSENTED: | A.W. BRADLEY, J., dissents, joined by ABRAHAMSON, J. (opinion filed). |
| NOT PARTICIPATING: | ZIEGLER, J., did not participate. |

ATTORNEYS:

For the plaintiff-appellant, there were briefs (in the court of appeals) by *Richard M. Esenberg*, *Brian McGrath*, *Clyde Taylor*, *Thomas C. Kamenick*, and *Wisconsin Institute for Law & Liberty*, Milwaukee. There was an oral argument by *Richard M. Esenberg.*

For the defendant-respondent, there was a brief (in the court of appeals) by *Stephen T. Trigg*, *Ralph A. Weber*, and *Gass Weber Mullins LLC*, Milwaukee. There was an oral argument by *Ralph A. Weber.*

An amicus curiae brief was filed on behalf of Law and University Professors and Academics by *Bernardo Cueto* and *Great Lakes Justice Center,* La Crosse, with whom on the brief were *Erin Elizabeth Mersino* and *Great Lakes Justice Center*, Lansing, Michigan.

An amicus curiae brief was filed on behalf of Association of Jesuit Colleges and Universities by *Thomas L. Shriner, Jr.,* *Aaron R. Wegrzyn*, and *Foley & Lardner LLP*, Milwaukee.

An amicus curiae brief was filed on behalf of the State of Wisconsin by *Ryan J. Walsh*, chief deputy solicitor general, with whom on the brief were *Brad D. Schimel*, attorney general, and *Amy C. Miller*, assistant solicitor general.

An amicus curiae brief was filed on behalf of American Association of University Professors by *Frederick Perillo* and *The Previant Law Firm*, *S.C.*, Milwaukee, with whom on the brief were *Risa L. Lieberwitz* and *American Association of University Professors*, and *Aaron M. Nisenson*, *Nancy A. Long*, and *American Association of University Professors*, Washington, D.C.

An amicus curiae brief was filed on behalf of Metropolitan Milwaukee Association of Commerce by *Michael B. Apfeld* and *Godfrey & Kahn*, *S.C.*, Milwaukee.

An amicus curiae brief was filed on behalf of Thomas More Society by *Andrew Bath*, *Esq.* and *Thomas More Society*, Chicago, Illinois.

An amicus curiae brief was filed on behalf of The National Association of Scholars, Edward J. Erler, Duke Pesta, and Mark Zunac by *James R. Troupis* and *Troupis Law Office*, Cross Plains,

2

with whom on the brief was *Kenneth Chesebro*, Cambridge, Massachusetts.

An amicus curiae brief was filed on behalf of the Wisconsin Association of Independent Colleges and Universities by *Andrew A. Hitt*, *Michelle L. Dama*, and *Michael Best & Friedrich LLP*, Madison.

An amicus curiae brief was filed on behalf of National Association of Manufacturers by *Bryan J. Cahill*, *Michael B. Apfeld*, and *Godfrey & Kahn*, *S.C.*, Milwaukee.

An amicus curiae brief was filed on behalf of University Academic Senate of Marquette University by *Amy L. MacArdy* and *Reinhart Boerner Van Deuren S.C.*, Milwaukee.

2018 WI 88

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP1240
(L.C. No. 2016CV3396)

STATE OF WISCONSIN      :      IN SUPREME COURT

John McAdams,

      Plaintiff-Appellant,

      v.

Marquette University,

      Defendant-Respondent.

**FILED**

**JUL 6, 2018**

Sheila T. Reiff
Clerk of Supreme Court

APPEAL from a judgment and an order of the Circuit Court for Milwaukee County, David A. Hansher, Judge. *Reversed and remanded.*

¶1 DANIEL KELLY, J. Marquette University suspended a tenured faculty member because of a blog post criticizing an encounter between an instructor and a student. Dr. John McAdams took exception to his suspension, and brought a claim against the University for breach of contract. He asserts that the contract guarantees to him the right to be free of disciplinary repercussions for engaging in activity protected by either the doctrine of academic freedom or the United States Constitution. The University denies Dr. McAdams' right to litigate his breach

of contract claim in our courts. Instead, it says, we must defer to its procedure for suspending and dismissing tenured faculty members. It claims we may not question its decision so long as it did not abuse its discretion, infringe any constitutional rights, act in bad faith, or engage in fraud.

¶2 The University is mistaken. We may question, and we do not defer. The University's internal dispute resolution process is not a substitute for Dr. McAdams' right to sue in our courts. The University's internal process may serve it well as an informal means of resolving disputes, but as a replacement for litigation in our courts, it is structurally flawed.

¶3 The undisputed facts show that the University breached its contract with Dr. McAdams when it suspended him for engaging in activity protected by the contract's guarantee of academic freedom. Therefore, we reverse the circuit court and remand this cause with instructions to enter judgment in favor of Dr. McAdams, conduct further proceedings to determine damages (which shall include back pay), and order the University to immediately reinstate Dr. McAdams with unimpaired rank, tenure, compensation, and benefits, as required by § 307.09 of the University's Statutes on Faculty Appointment, Promotion and Tenure (the "Faculty Statutes").[1]

---

[1] This case is before us on bypass of the court of appeals pursuant to Wis. Stat. § (Rule) 809.60 (2015-16). We are reviewing an order of the Milwaukee County Circuit Court, the Honorable David A. Hansher presiding, that denied Dr. McAdams' motion for summary judgment and granted the University's cross-motion for summary judgment.

## I. FACTUAL BACKGROUND

### A. Dr. McAdams' Contract with the University

¶4  Dr. McAdams has been a professor of political science at Marquette University since 1977; he received tenure in 1989. His most recent contract is evidenced by an appointment letter dated March 1, 2014.  It incorporates, and is therefore subject to, the University's Faculty Statutes, the Faculty Handbook, and the other documents identified in the agreement:

> This appointment/contract is subject to the University's statutes on Faculty Appointment, Promotion and Tenure [the Faculty Statutes].  As a Marquette faculty member, you agree to comply with applicable Marquette academic and business policies, including those found in the Faculty Handbook, University Policies and Procedures (UPP) and the Marquette University Intellectual Property Policy.[2]

When we refer to the "Contract" in this opinion, we mean the appointment letter of March 1, 2014, along with all the authorities it incorporates.

¶5  "Tenure" at the University means:

> [A] faculty status that fosters an environment of free inquiry without regard for the need to be considered for reappointment.  Tenure is reserved for Regular Faculty who are recognized by the University as having the capacity to make unique, significant, and long-term future contributions to the educational mission of the University.  Tenure is not a reward for services performed; it is a contract and property right granted in accordance with this Chapter[.]

---

[2] The Faculty Statutes and the Faculty Handbook constitute the equivalent of contract provisions. See Little Chute Area Sch. Dist. v. Wis. Educ. Ass'n Council, 2017 WI App 11, ¶31, 373 Wis. 2d 668, 892 N.W.2d 312 ("The parties may agree to incorporate another document by reference, . . . .").

3

Faculty Statute § 304.02. Tenured faculty are entitled to yearly reappointment:

> Excepting cases of intervening termination for cause and cases of leave of absence or retirement as provided below, every tenured member of the Regular Faculty will be tendered notification of compensation, and every non-tenured member of the Regular Faculty not otherwise notified as provided in Section 304.07, will be tendered an annual reappointment, at a rank and compensation not less favorable than those which the faculty member then enjoys, . . . .

Faculty Statute § 304.09; see also § 304.07 ("Unless tenured, no faculty member is entitled to reappointment.").

¶6 The Faculty Statutes forbid the suspension or dismissal of a faculty member without cause: "The cognizant appointing authority of the University may initiate and execute procedures by which a faculty member's reappointment may be denied or revoked, or any current appointment may be suspended or terminated, for cause as defined therein." Faculty Statute § 306.01.

## B. The Incident

¶7 On November 9, 2014, Dr. McAdams published a post on his personal blog, the Marquette Warrior, in which he criticized a philosophy instructor, Cheryl Abbate, for her interchange with a student attending her Theory of Ethics class.[3] Dr. McAdams'

---

[3] Before he published the post, Dr. McAdams contacted Instructor Abbate for comment. She refused. In emailed conversations with others, she explained that she believed he contacted her "so it would look like he 'got both sides.'" She said she believed Dr. McAdams is a "flaming bigot, sexist, and homophobic idiot," who "wants to insert his ugly face into my class business to try to scare me into silence."

blog post said that, after Instructor Abbate listed a number of issues on the board, including "gay rights," she "airily said that 'everybody agrees on this, and there is no need to discuss it.'" One of the students approached Instructor Abbate after class and said that the issue of gay rights should have been open for discussion. The blog post says Instructor Abbate replied that "some opinions are not appropriate, such as racist opinions, sexist opinions," that "you don't have a right in this class to make homophobic comments," that she would "take offense" if a student opposed women serving in certain roles, that a homosexual individual would take similar offense if a student opposed gay marriage, and that "[i]n this class, homophobic comments, racist comments, will not be tolerated." The blog post says Instructor Abbate "then invited the student to drop the class." Dr. McAdams commented that Instructor Abbate employed "a tactic typical among liberals now," namely that "[o]pinions with which they disagree are not merely wrong, and are not to be argued against on their merits, but are deemed 'offensive' and need to be shut up." Dr. McAdams then quoted Charles Krauthammer for the proposition that "[t]he proper word for that attitude is totalitarian." Finally, the blog post contained a clickable link to Instructor Abbate's contact information and to her own, publicly-available website.[4]

¶8 Two days later, after having received an email criticizing her conduct in this incident, Instructor Abbate

---

[4] The entire text of the blog post appears in the attached exhibit.

5

filed a formal complaint against Dr. McAdams with the University. The incident came to national attention after other media outlets picked up the story from Dr. McAdams' blog post. Instructor Abbate subsequently received some strongly-worded and offensive communications (emails, blog comments, and letters) from third parties, including some that expressed violent thoughts. Almost all of the feedback occurred after the story spread beyond Dr. McAdams' blog post.

¶9  By letter dated December 16, 2014, Dean Richard Holz suspended Dr. McAdams (with pay), but identified no reason for doing so. Dean Holz's follow-up letter of January 30, 2015, identified the blog post of November 9, 2014, as the justification for the suspension. It also stated the post violated Faculty Statute § 306.03, and that, therefore, the University intended to revoke his tenure and terminate his employment because his "conduct clearly and substantially fails to meet the standards of personal and professional excellence that generally characterizes University faculties."

¶10 The process for suspending or dismissing a tenured faculty member appears in chapters 306 and 307 of the Faculty Statutes (the "Discipline Procedure"). On August 14, 2015, the University notified Dr. McAdams that, pursuant to the Discipline Procedure's requirements, the Faculty Hearing Committee (the "FHC") would convene to consider his case. The FHC is an advisory body whose membership consists solely of University faculty members. The FHC described its charge in this case as follows:

Under both the Faculty Statutes and the Statutes for the University Academic Senate, the FHC acts as an advisory body in contested cases of appointment non-renewal, or for suspension or termination of tenured faculty for absolute or discretionary cause. Its advice is presented to the President. The specific charge of the Committee in such cases is to convene a hearing "to determine the existence of cause" as defined in Sections 306.02 and .03 of the Faculty Statutes, "and to make findings of fact and conclusions." Those conclusions may, if the Committee finds it is warranted by the evidence, contain a recommendation "that an academic penalty less than dismissal" be imposed.

(Footnotes omitted.)

¶11 One of the FHC's members, Dr. Lynn Turner, publicly expressed her opinion of Dr. McAdams, his blog post, and Instructor Abbate, prior to her appointment. She, along with several of her colleagues, signed an open letter published in the Marquette Tribune. The letter says, in relevant part:

The following department chairs in the Klingler College of Arts & Sciences deplore the recent treatment of a philosophy graduate student instructor by political science professor John McAdams on his Marquette Warrior blog. We support Ms. Abbate and deeply regret that she has experienced harassment and intimidation as a direct result of McAdams's actions. McAdams's actions——which have been reported in local and national media outlets——have harmed the personal reputation of a young scholar as well as the academic reputation of Marquette University. They have negatively affected campus climate, especially as it relates to gender and sexual orientation. And they have led members of the Marquette community to alter their behavior out of fear of becoming the subject of one of his attacks.

Perhaps worst of all, McAdams has betrayed his role as a faculty member by pitting one set of students against another, by claiming the protection of academic freedom while trying to deny it to others, and by exploiting current political issues to promote his personal agenda. This is clearly in violation

7

of . . . the Academic Freedom section of Marquette's Faculty Handbook[.]

. . . .

McAdams . . . has failed to meet the standards we aspire to as faculty, as well as the broader ethical principles that guide Marquette's mission as a Jesuit, Catholic institution.

¶12 Dr. McAdams requested that Dr. Turner recuse herself from the FHC's work because the letter created the appearance of bias against him. The FHC unanimously rejected the request, stating that the letter evidenced no disqualifying bias because, inter alia, her comments did not bear on the issues the committee would decide. In any event, the FHC said, this cannot be a disqualifying factor because "every single one of the committee members present at our last meeting admit to having formed a prior positive or negative opinion of the propriety of Dr. McAdams's Nov. 9, 2014 blog post." The FHC said it would be unable to do its work if its membership were limited to those who had not already formed an opinion about the subject matter of Dr. McAdams' case.

¶13 Over the course of four days, the FHC received documentary and testimonial evidence from the University and Dr. McAdams. After completing its work, the FHC forwarded its report, titled "In the Matter of the Contested Dismissal of Dr. John C. McAdams" and dated January 18, 2016 (the "Report"), to the University's President, Michael Lovell. The Report concludes as follows:

The Committee [the FHC] therefore concludes that discretionary cause under FS [Faculty Statute] § 306.03 has been established, but only to the degree necessary to support a penalty of suspension. The

8

> Committee concludes that the University has established neither a sufficiently egregious failure to meet professional standards nor a sufficiently grave lack of fitness to justify the sanction of dismissal. Instead, the Committee concludes that only a lesser penalty than dismissal is warranted. The Committee thus recommends that Dr. McAdams be suspended, without pay but with benefits, for a period of no less than one but no more than two semesters.

In keeping with its role as an advisory body, the Report made only a recommendation to President Lovell: "For the reasons stated above, the Committee recommends that the University suspend Dr. McAdams, without pay but with benefits, for a period of one to two semesters."

¶14 By letter of March 24, 2016 (the "Discipline Letter"), President Lovell informed Dr. McAdams that, after "carefully reviewing [the FHC's] report along with the transcriptions of your formal hearing last September," he had "decided to accept your fellow faculty members' recommendation to suspend you without pay." The suspension became effective April 1, 2016, and was to continue until the end of the fall 2016 semester. President Lovell——on his own initiative——added an additional term to the FHC's recommended sanction. He informed Dr. McAdams that his resumption of duties (and pay) would be "conditioned upon you delivering a written statement to the President's Office by April 4, 2016," which would be shared with Instructor Abbate, and which must contain the following:

- Your acknowledgement and acceptance of the unanimous judgment of the peers who served on the Faculty Hearing Committee.

- Your affirmation and commitment that your future actions and behavior will adhere to the standards of higher education as defined in the Marquette

9

University Faculty Handbook, Mission Statement and Guiding Values.

- Your acknowledgement that your November 9, 2014, blog post was reckless and incompatible with the mission and values of Marquette University and you express deep regret for the harm suffered by our former graduate student and instructor, Ms. Abbate.

Dr. McAdams refused to write the required letter.

## II. PROCEDURAL HISTORY

¶15  On May 2, 2016, Dr. McAdams filed a complaint against the University in the Milwaukee County Circuit Court, asserting (inter alia) that the University breached his Contract by suspending and then dismissing him.[5]  He demanded damages, an injunction requiring reinstatement as a tenured member of the Marquette faculty, and costs and attorneys' fees.  Both parties

---

[5] Dr. McAdams' complaint contained six counts, which (in summary form) claimed the following:

(1) The University breached the Contract when it suspended him without cause on December 16, 2014;

(2) The University breached the Contract when it suspended him without cause and without pay on April 1, 2016;

(3) The University breached the Contract when it failed to tender reappointment contracts for the 2015-16 and 2016-17 academic years;

(4) The University breached the Contract by conditioning his reinstatement to the faculty on submission of a letter accepting the FHC's judgment and expressing regret for his actions;

(5) The University breached his due process rights as guaranteed by the Contract; and

(6) The University breached the Contract's implied covenant of good faith and fair dealing.

10

eventually moved for summary judgment. On May 4, 2017, the circuit court issued a decision and order granting summary judgment in favor of the University and dismissing Dr. McAdams' complaint with prejudice.[6]

¶16 The circuit court concluded it must defer to the University's resolution of Dr. McAdams' claims: "[T]he Court finds the following: (1) The FHC Report deserves deference; (2) The [suspension] letter from President Lovell deserves deference; . . . ." McAdams v. Marquette Univ., No. 2016CV3396, Order for Summary Judgment, 7 (Cir. Ct. for Milwaukee Cty. May 4, 2017). It said it must defer because "public policy compels a constraint on the judiciary with respect to Marquette's academic decision-making and governance," out of a recognition that "[p]rofessionalism and fitness in the context of a university professor are difficult if not impossible issues for a jury to assess." Id. at 11.

¶17 The circuit court also concluded that the University's internal dispute resolution process afforded Dr. McAdams sufficient "due process": "[T]he Court finds the following: . . . (3) Dr. McAdams was afforded due process that he was entitled to during the FHC hearing; . . . ." Id. at 7. It explained that "Dr. McAdams expressly agreed as a condition of his employment to abide by the disciplinary procedure set forth in the Faculty Statutes," procedures that the court said

---

[6] The Honorable David A. Hansher presided at the summary judgment hearing, authored the summary judgment decision and order, and issued the judgment.

11

afforded "Dr. McAdams . . . a detailed, quasi-judicial process which gave him an adequate opportunity to meaningfully voice his concerns." Id. at 11.

¶18 We accepted Dr. McAdams' petition to bypass the court of appeals and now reverse the circuit court's judgment.

12

### III. STANDARD OF REVIEW

¶19 We review the disposition of a motion for summary judgment de novo, applying the same methodology the circuit courts apply. Green Spring Farms v. Kersten, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987); see also Borek Cranberry Marsh, Inc. v. Jackson Cty., 2010 WI 95, ¶11, 328 Wis. 2d 613, 785 N.W.2d 615 ("We review the grant of a motion for summary judgment de novo, . . . ."). First, we "examine the pleadings to determine whether a claim for relief has been stated." Green Spring Farms, 136 Wis. 2d at 315. Then, "[i]f a claim for relief has been stated, the inquiry . . . shifts to whether any factual issues exist." Id. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (2015-16)[7]; see also Columbia Propane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶11, 261 Wis. 2d 70, 661 N.W.2d 776 (citing § 802.08(2) (2001-02)).

¶20 The only dispute before us is the proper interpretation of a contract. This presents a question of law, which we review de novo. Deminsky v. Arlington Plastics Mach., 2003 WI 15, ¶15, 259 Wis. 2d 587, 657 N.W.2d 411 ("Interpretation of a contract is a question of law which this court reviews de novo.").

---

[7] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

13

IV. DISCUSSION

¶21 Before we reach the merits of Dr. McAdams' complaint, we must explain why we do not defer, as the circuit court did, to the results of the University's internal Discipline Procedure. We will then address Dr. McAdams' claim that the University breached his Contract.

A. Deference to the University

¶22 The circuit court deferred to the University's conclusion that it had not breached the Contract for three reasons. First, it said Dr. McAdams agreed to be bound by the University's Discipline Procedure. McAdams, No. 2016CV3396, Order for Summary Judgment, 11. Second, it analogized the Discipline Procedure to an arbitration and concluded that it must afford the results of the University's process the same deference we give to arbitration awards. See id. at 13-14. And third, it said it should defer to the University for the same reasons we have historically given either "great weight" or "due weight" deference to administrative agency decisions.[8] See id. at 11-13. For the reasons we discuss below, we will not defer to the University on any of these bases. And neither the circuit court nor the University has offered any other ground upon which we could conclude that Dr. McAdams' right to litigate his contract claim in our courts is either foreclosed or limited.

---

[8] See Harnischfeger Corp. v. LIRC, 196 Wis. 2d 650, 659-60, 539 N.W.2d 98 (1995), overruled by Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶¶82-84, ___ Wis. 2d ___, ___ N.W.2d ___.

14

¶23 We begin with the proposition that "litigants must be given their day in court. Access to the courts is an essential ingredient of the constitutional guarantee of due process." Piper v. Popp, 167 Wis. 2d 633, 644, 482 N.W.2d 353 (1992); see also Armstrong v. Manzo, 380 U.S. 545, 552 (1965) ("A fundamental requirement of due process is 'the opportunity to be heard.' It is an opportunity which must be granted at a meaningful time and in a meaningful manner." (citation omitted)); see also State ex rel. Universal Processing Servs. of Wis., LLC v. Circuit Court of Milwaukee Cty., 2017 WI 26, ¶5, 374 Wis. 2d 26, 892 N.W.2d 267 ("The Wisconsin Constitution requires the state to provide a judicial system for the resolution of disputes. Access to state courts for conflict resolution is thus implicit in the state constitution."); Penterman v. Wis. Elec. Power Co., 211 Wis. 2d 458, 474, 565 N.W.2d 521 (1997) ("The right of access to the courts is secured by the First and Fourteenth Amendment[s]. It entitles the individual to a fair opportunity to present his or her claim. Such a right exists where the claim has a 'reasonable basis in fact or law.' Judicial access must be 'adequate, effective, and meaningful.'" (footnote and citations omitted) (quoted sources omitted)).

15

¶24 The scope of judicial review is, however, subject to statutory and judicially-developed limitations.[9] And, of course, parties may choose to have their disputes resolved through extra-judicial means, thereby confining the judiciary's review to a very limited role.[10] We conclude that none of these substitutionary or limiting principles apply to Dr. McAdams' contract dispute with the University.[11]

---

[9] See, e.g., Wis. Stat. § 227.57 (describing scope of judicial review afforded to administrative agency decisions); Ottman v. Town of Primrose, 2011 WI 18, ¶35, 332 Wis. 2d 3, 796 N.W.2d 411 (describing the court's common-law certiorari review as limited to: "(1) whether the municipality [or administrative agency or inferior tribunal] kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question").

[10] See, e.g., Wis. Stat. § 788.10(1)(a)-(d) (limiting judicial review of arbitration awards to circumstances "(a) [w]here the award was procured by corruption, fraud or undue means; (b) [w]here there was evident partiality or corruption on the part of the arbitrators, or either of them; (c) [w]here the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; [or] (d) [w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made"); Joint Sch. Dist. No. 10, Jefferson v. Jefferson Educ. Ass'n, 78 Wis. 2d 94, 116, 253 N.W.2d 536 (1977) ("Under common law rulings, an award may be set aside for fraud or partiality or gross mistake by the arbitrator; fraud or misconduct by the parties affecting the result; or want of jurisdiction in the arbitrator.").

[11] Neither the University nor the circuit court identified any statutory limitations on the scope of judicial review available in this case, and so we do not address any here.

16

### 1. Contractual Limitations on Judicial Review

¶25 The most obvious reason we will not defer to the University is simply that the parties never agreed that its internal Discipline Procedure would either replace or limit the adjudication of their contract dispute in our courts. They certainly could have agreed to an extra-judicial resolution of their contract dispute. This is a common feature in society today and is accomplished most often through an arbitration agreement. "[A]rbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." Joint Sch. Dist. No. 10, Jefferson v. Jefferson Educ. Ass'n, 78 Wis. 2d 94, 101, 253 N.W.2d 536 (1977) (internal quotation mark omitted) (quoting United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)); see also Dane Cty. v. Dane Cty. Union Local 65, AFSCME, AFL-CIO, 210 Wis. 2d 267, 278-79, 565 N.W.2d 540 (Ct. App. 1997) (Arbitration "is an informal process, where the parties have bargained to have a decision maker who is not restricted by the formalistic rules that govern courtroom proceedings."). It is true, as the University argues, that Dr. McAdams agreed he would submit to the University's Discipline Procedure when he accepted the Contract. But the Discipline Procedure does not describe an arbitration-style agreement.

¶26 Our exhaustive review of the Faculty Statutes reveals no indication that the University and Dr. McAdams agreed the Discipline Procedure would supplant the courts or limit their

17

review of a contractual dispute.[12] Two of the Faculty Statutes acknowledge Dr. McAdams' right to seek judicial adjudication of his claims. The first describes the right negatively by demarcating a period of time in which the parties agree <u>not</u> to litigate:

> So long as the periodic compensation and benefits provided by the faculty member's appointment are both continued, and during such further periods of negotiation, mediation, hearing, or review as the parties may mutually stipulate, both parties shall diligently continue in good faith to attempt a mutually-acceptable resolution of the issues between them by one or more of the procedures described in the three preceding sections, <u>and neither shall, during such period, resort to or encourage litigation</u>, demonstration, or tactics of duress, embarrassment, or censure against the other; provided that this paragraph shall not be construed so as to require the University to continue the faculty member's duty assignment during such period.

Faculty Statute § 307.08 (emphasis added). That period had elapsed by the time Dr. McAdams filed his suit because his pay had been terminated and the Discipline Procedure had concluded.

---

[12] As an integrated part of the Contract, we interpret the Faculty Statutes as we would any other contract provision. <u>Seitzinger v. Cmty. Health Network</u>, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426 ("The primary goal in contract interpretation is to give effect to the parties' intentions. We ascertain the parties' intentions by looking to the language of the contract itself." (citation omitted)); <u>see also</u> <u>Tufail v. Midwest Hosp., LLC</u>, 2013 WI 62, ¶28, 348 Wis. 2d 631, 833 N.W.2d 586 (stating that courts construe contract language "according to its plain or ordinary meaning, . . . consistent with 'what a reasonable person would understand the words to mean under the circumstances'" (internal citation omitted) (quoted source omitted)).

So this provision recognizes Dr. McAdams' right to bring his claim to court.

¶27 The Faculty Statutes also contain an explicit, positively-stated recognition of Dr. McAdams' right to litigate:

> To the extent that none of the foregoing procedures produces a resolution of the issues arising out of a timely objection to a faculty member's non-renewal, suspension, or termination, at or prior to the time specified in the preceding paragraph, the University shall, for a period of six months thereafter, <u>or until the final determination of any judicial action which may be commenced within such period to test the validity of the non-renewal, suspension, or termination</u>, hold itself ready to reinstate the faculty member, with unimpaired rank, tenure, compensation, and benefits, <u>to the extent that the faculty member's entitlement thereto may be judicially adjudged or decreed</u>, or conceded by the University in such interval.

Faculty Statute § 307.09 (emphasis added). This provision unambiguously recognizes that the University's suspension and dismissal decisions are subject to litigation in our courts. It was with good reason that the University conceded, during oral arguments, that it had no express agreement with Dr. McAdams that the Discipline Procedure would preclude his right to litigate his cause here.

¶28 The University and Dr. McAdams could have agreed that the court would defer to the Report and Discipline Letter in the same way we defer to arbitration decisions. They could have done that, but they did not. They did the opposite: The University agreed <u>it</u> would defer to the <u>court's</u> adjudication of Dr. McAdams' right to reinstatement.

19

¶29 The Faculty Statutes' description of our role does not resemble the method by which we review arbitration awards. When we review a party's challenge to such a decision, we focus on the process that produced the award: "[T]he court will not overturn the arbitrator's decision for mere errors of law or fact, but only when 'perverse misconstruction or positive misconduct [is] plainly established, or if there is a manifest disregard of the law, or if the award itself is illegal or violates strong public policy.'" City of Madison v. Madison Prof'l Police Officers Ass'n, 144 Wis. 2d 576, 586, 425 N.W.2d 8 (1988) (alteration in original) (quoted source omitted). We will confirm arbitration awards even when they are incorrect: "Because arbitration is what the parties have contracted for, the parties get the arbitrator's award, whether that award is correct or incorrect as a matter of fact or of law." Id.

¶30 The Faculty Statutes do not contemplate this type of review. They actually anticipate that the court will reach the merits of Dr. McAdams' claim. The purpose of the "judicial action" identified in Faculty Statute § 307.09 is to "test the validity" of the suspension. It is not to test the process that led to the suspension; it is instead to determine whether there was a legitimate basis for it. This is a question of merit, not procedure.

¶31 The University makes this understanding even more explicit by pledging to "hold itself ready to reinstate" the faculty member "to the extent that the faculty member's entitlement thereto may be judicially adjudged or decreed."

20

Faculty Statute § 307.09. This is not evocative of an arbitration-style review, which would exhaust itself upon declaring the decision is either defective or sound. A declaration that a faculty member is entitled to reinstatement is a substantive evaluation of the underlying dispute's merits. Thus, the Faculty Statutes acknowledge that the court will conduct an unabridged inquiry into the parties' compliance with their contractual obligations, not an arbitration-style review.

¶32 Therefore, the circuit court erred when it concluded it must defer to the University because "Dr. McAdams expressly agreed as a condition of his employment to abide by the disciplinary procedure set forth in the Faculty Statutes, incorporated by reference into his contract." See McAdams, No. 2016CV3396, Order for Summary Judgment, 11. The circuit court's analysis ended prematurely because it failed to even mention the Faculty Statutes that describe the relationship between the University's Discipline Procedure and Dr. McAdams' right to bring the dispute to court.

¶33 We conclude that the Contract's plain meaning is that the parties did not agree that the Discipline Procedure would substitute for, or limit, Dr. McAdams' right to litigate in our courts. This cannot end our analysis, however, because the circuit court deferred to the University on the additional ground that the Discipline Procedure is analogous to an arbitral proceeding. It concluded that the Report and Discipline Letter are entitled to the same deference we afford to arbitration awards, see id. at 13-14, even if there was no agreement that

21

the Discipline Procedure would authoritatively resolve their dispute.

## 2. The Discipline Procedure's Fundamental Procedural Flaws

¶34 The Report and Discipline Letter are not entitled to deference as something comparable to an arbitration award. The Discipline Procedure is an intricate, thorough, and extensive process. Indeed, at least superficially, it closely resembles a judicial proceeding. In light of the 123-page Report the FHC produced, the process obviously consumed a great deal of several faculty members' attention and valuable time. But all of this cannot make up for the unacceptable bias with which the FHC was infected, or the FHC's lack of authority to bind the parties to its decision. Although these shortcomings are enough to convince us that we must not defer to the Discipline Procedure's results, there is an even greater shortcoming at the heart of the process: The Discipline Procedure has nothing to say about how the actual decision-maker is to decide the case. The Faculty Statutes recognize that, at Marquette University, the authority to suspend or dismiss tenured faculty members rests exclusively with the president, and that his exercise of discretion is subject to no procedural requirements or limitations. There is no process here to which we can defer. We will address each of these defects in turn.

*

¶35 The FHC, to which the Faculty Statutes commit the responsibility for conducting the Discipline Procedure, was not an impartial tribunal. But it is the only entity authorized by

22

the Discipline Procedure to hear testimony from the contesting parties. "[T]he Faculty Hearing Committee (hereinafter the FHC) serves as the advisory body in cases of contested appointment non-renewal, and suspension or termination (hereinafter dismissal) of a tenured faculty member for absolute or discretionary cause." Faculty Statute § 307.07(1). The FHC is "composed of seven tenured faculty members elected by the faculty as a whole under the supervision of the Committee on Committees and Elections." § 307.07(6).

¶36 The FHC holds hearings at which the faculty member may participate with assistance of counsel. Faculty Statute § 307.07(11), (14). It is the University's responsibility, through its designee, to present the case against the faculty member. § 307.07(13) ("The University Administration must appear at the hearing by a designated representative, and it must make the initial showing."). The FHC may receive both documentary and testimonial evidence. § 307.07(10), (15). The University bears the burden of making its case with "clear and convincing evidence in the record considered as a whole." § 307.07(13).

¶37 Once the FHC has received the parties' evidence and conducted its deliberations, it issues "findings of fact and conclusions." Faculty Statute § 307.07(18). If it decides dismissal is not warranted, "its findings of fact and conclusions will set forth a recommendation to that effect together with supporting reasons." See id. Finally, the FHC

23

conveys its findings of fact and conclusions to the University president and to the affected faculty member. § 307.07(19).

¶38 The Faculty Statutes describe a procedure and tribunal that, on their face, are characteristic of an arbitral system. Confidence in an arbitration's outcome, however, is predicated on confidence in the arbitrator. That is why we presume parties intend their arbitrators to be impartial. See Borst v. Allstate Ins. Co., 2006 WI 70, ¶3, 291 Wis. 2d 361, 717 N.W.2d 42 ("We adopt a presumption of impartiality among all arbitrators, whether named by the parties or not."); Nicolet High Sch. Dist. v. Nicolet Educ. Ass'n, 118 Wis. 2d 707, 712-13, 348 N.W.2d 175 (1984) ("A final and binding arbitration clause signifies that the parties to a labor contract desire to have certain contractual disputes determined on the merits by an impartial decision-maker whose determination the parties agree to accept as final and binding." (quoting City of Oshkosh v. Oshkosh Pub. Library Clerical & Maint. Emps. Union Local 796–A, 99 Wis. 2d 95, 103, 299 N.W.2d 210 (1980)); Diversified Mgmt. Servs., Inc. v. Slotten, 119 Wis. 2d 441, 448, 351 N.W.2d 176 (Ct. App. 1984) ("If parties are to be encouraged to submit their disputes to arbitration as an alternative to litigation, they must be assured an impartial tribunal."). Cf. Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 147 (1968) (stating that federal statutory "provisions show a desire of Congress to provide not merely for any arbitration but for an impartial one"). That is also why, with respect to arbitrations governed by the Wisconsin Arbitration Act, we will set aside an

24

award "[w]here there was evident partiality . . . on the part of the arbitrators."  Wis. Stat. § 788.10(1)(b).

¶39  In this case, the FHC's impartiality was compromised by one of its members.  Prior to her appointment to the FHC, Dr. Lynn Turner made her opinion of Dr. McAdams and his blog post available for all to see and read.  By subscribing her name to an open letter published in the Marquette Tribune, Dr. Turner:

a.  Deplored Dr. McAdams' treatment of Ms. Abbate;

b.  Expressed support for Ms. Abbate's position in the dispute;

c.  Asserted that Ms. Abbate had been harassed and intimidated as a direct result of Dr. McAdams' blog post;

d.  Stated that Dr. McAdams had harmed Ms. Abbate's personal and academic reputation;

e.  Claimed Dr. McAdams had created a negative campus climate and caused members of the Marquette community to fear becoming subjects of his attacks;

f.  Accused Dr. McAdams of betraying his role as a faculty member by asserting the protection of academic freedom and exploiting political issues to further his personal agenda;

g.  Stated that Dr. McAdams' action was a clear violation of the Academic Freedom section of the Faculty Handbook; and

h.  Concluded that Dr. McAdams had "failed to meet the standards we aspire to as faculty, as well as the broader ethical principles that guide Marquette's mission as a Jesuit, Catholic institution."

¶40  Remarkably, the FHC said this evidenced no disqualifying bias because she had not commented on anything the FHC would be considering.  The Report Dr. Turner helped produce

25

says otherwise, as evidenced by the following excerpts (keyed to the lettered paragraphs above):

a. "[T]he Committee concludes that the University has established by clear and convincing evidence that Dr. McAdams's conduct with respect to his November 9, 2014 blog post violated his obligation to fellow members of the Marquette community by recklessly causing indirect harm to Ms. Abbate through his conduct, harm that was substantial, foreseeable, easily avoidable, and not justifiable."

b. "As the AAUP has feared, Dr. McAdams's use of selective quotations from Ms. Abbate's classroom and after-class discussion has resulted in a chilling effect on Ms. Abbate——indeed she is no longer on the campus to speak at all."

   "Ms. Abbate, who was by all indications a star graduate student, was unable to focus on preparing her dissertation topic defense by the end of November."

c. "University spokesperson Brian Dorrington later stated, in reference to Dr. McAdams's suspension, that '[t]he university has a policy in which it clearly states that it does not tolerate harassment . . . .'"

d. "Dr. McAdams has also stated that he does not have an obligation to protect the reputations of members of the Marquette community."  "Dr. McAdams has stated that the harm to Ms. Abbate occurred due only to truthful reporting of facts."  "[I]t was 'Abbate's actions,' not his, 'that caused the problem.'"  "Dr. McAdams does not accept that Ms. Abbate was harmed by this incident."

e. "The speech of other faculty at Marquette may be chilled as well as a result of this incident."

   "Junior faculty in the Political Science Department appear to have great anxiety that they may be Dr. McAdams's next targets . . . ."

f. "If the University presses forward, Dr. McAdams promises, Marquette will 'become ground zero in the battle over freedom of expression in academia' and will be 'the poster child for political correctness on America's campuses.'"

26

g. "But academic freedom has its limits, limits that are slightly more pronounced in the case of extramural statements, and Dr. McAdams's Nov. 9 blog post exceeded those limits by recklessly causing harm indirectly to Ms. Abbate that was substantial, foreseeable, easily avoidable, and not justified."

e. "The Committee therefore concludes that this conduct clearly and substantially failed to meet the standard of personal and professional excellence that generally characterizes University faculties."

If Dr. Turner did not know she would be addressing matters on which she had already taken a very public and definite stand, she should have recused herself once she discovered the connection.

¶41 The Faculty Handbook says that a "member of . . . the Faculty Hearing Committee whose impartiality might be compromised by participating in the processing of the grievance ought to recuse himself or herself from consideration of the grievance." Faculty Handbook art. 8.02 (Conflicts of Interest). Parties to an arbitration agreement may contractually calibrate the level of bias they find acceptable, and we will generally

27

accept whatever standard upon which they agree.[13] The Faculty Statutes, however, do not describe the level of disqualifying bias. But we take notice that the American Arbitration Association says that an arbitrator should "have no relation to the underlying dispute or to the parties or their counsel that may create an appearance of bias," nor should she have any "personal or financial interest in the results of the proceeding."[14] And when an arbitrator fails to disclose information that may call his impartiality into question, we inquire into

---

[13] "The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business." Richco Structures v. Parkside Vill., Inc., 82 Wis. 2d 547, 561, 263 N.W.2d 204 (1978) (quoting Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 151 (1968) (White, J., concurring)); see also Richco Structures, 82 Wis. 2d at 557 ("Because arbitration is a contractual arrangement, albeit endorsed and implemented by statute, our construction of 'evident partiality' should also be structured to enhance the parties' opportunity to assess an arbitrator's qualifications with a minimum of judicial interference."). Cf. Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co., 307 F.3d 617, 620 (7th Cir. 2002) ("Parties are free to choose for themselves to what lengths they will go in quest of impartiality. . . . [A]ll participants may think the expertise-impartiality tradeoff worthwhile; the [federal] Arbitration Act does not fasten on every industry the model of the disinterested generalist judge.").

[14] See American Arbitration Association, Employment: Arbitration Rules and Mediation Procedures 15 (available at https://www.adr.org/sites/default/files/employment_arbitration_rules_and_mediation_procedures_0.pdf) (listing qualifications of neutral arbitrators).

28

whether the reasonable person, as a party to the arbitration proceeding, upon being advised of the undisclosed matters, would have such doubts regarding the prospective arbitrator's impartiality that he or she would investigate further, would demand that the arbitration be conducted on terms which would provide checks on the arbitrator's exercise of discretion, or would take other protective measures to assure an impartial arbitration and award.

Richco Structures v. Parkside Vill., Inc., 82 Wis. 2d 547, 562, 263 N.W.2d 204 (1978).

¶42 Under any reasonable standard of impartiality, Dr. Turner would be disqualified. She publicly inserted herself into the dispute and expressed a personal interest in its outcome. And she did not just express her opinions on these matters in passing——she committed herself to them in writing. Having done so, she could not decide the FHC proceedings in favor of Dr. McAdams without contradicting what she had already said to the entire Marquette University campus. These are not anonymous members of the public to whom she would be admitting that her initial convictions were mistaken. They are her professional colleagues and students. The natural human impulse to resist acknowledging a mistake, especially in light of the audience to whom she would be making the acknowledgement, is sufficiently powerful to affect Dr. Turner's consideration of the dispute. If an arbitrator evidenced this level of bias, we would set aside the resulting award. The FHC's composition was unacceptably compromised by Dr. Turner's bias.

\*

¶43 The Discipline Procedure is not analogous to an arbitration proceeding, as the circuit court assumed, for the

29

further reason that it resulted in mere advice, not in an authoritative decision. The point of an arbitration is to produce a final and binding resolution of the parties' dispute. City of Manitowoc v. Manitowoc Police Dep't, 70 Wis. 2d 1006, 1012, 236 N.W.2d 231 (1975) (stating that "an arbitration award must finally settle the controversy"); Dundon v. Starin, 19 Wis. 278 (*261), 283-85 (*266-67) (1865) (reversing judgment because the arbitration award was not "final and definite"); see also Dane Cty. Union Local 65, AFSCME, AFL-CIO, 210 Wis. 2d at 279 ("Arbitration is also designed to bring an end to controversy. Employees, unions and employers all rely on the finality of arbitration decisions in ordering their affairs.").

¶44 The Discipline Procedure, however, is incapable of producing such a result. The Report says the FHC is just an advisory body: "Under both the Faculty Statutes and the Statutes for the University Academic Senate, the FHC acts as an advisory body in contested cases of appointment non-renewal, or for suspension or termination of tenured faculty for absolute or discretionary cause." See Faculty Statute § 307.07(1) ("[T]he Faculty Hearing Committee . . . serves as the advisory body in cases of contested appointment non-renewal, and suspension or termination . . . of a tenured faculty member for absolute or discretionary cause."). In keeping with the nature of that body, it issues nothing authoritative. The Report says the end result of the FHC's work is merely advice: "[The FHC's] advice is presented to the President." See § 307.07(18) ("If the FHC concludes that an academic penalty less than dismissal is

30

warranted by the evidence, its findings of fact and conclusions will set forth a recommendation to that effect . . . .").

¶45 If we are supposed to defer to the Discipline Procedure because of its resemblance to an arbitration, the analogy does not hold up. This process cannot produce one of its essential hallmarks. We defer to arbitration decisions because they are authoritative resolutions of the disputes they address. The Discipline Procedure produced advice, not a decision. We do not defer to advice.

\*

¶46 The FHC's lack of authority leads us to the final reason we cannot give arbitration-style deference to the University's decision to suspend Dr. McAdams: There was no relevant process to which we could defer. In one sense, all of the time, energy, and resources that went into the Discipline Procedure and the richly-detailed Report are distractions from the necessary focus of our analysis. Neither the FHC nor the Report decided anything. It was President Lovell, not the FHC, who decided whether Dr. McAdams would be disciplined. It was President Lovell, not the FHC, who decided the nature of the discipline that should be imposed. It was President Lovell, not the FHC, who had the authority to impose the discipline. It was President Lovell who actually meted out the discipline when he sent Dr. McAdams the Discipline Letter. And it was President Lovell who created the conditions on reinstatement that have kept Dr. McAdams in suspension limbo. Consequently, the

31

Discipline Letter, not the FHC's Report, is the relevant point of reference.[15]

¶47 We assume, for the purpose of this case only, that the University must engage the Discipline Procedure's mechanisms before it disciplines a tenured faculty member.[16] But as a matter of process, the Discipline Procedure controls only the FHC, not the president. To the extent it references the

---

[15] We note that Dean Holz's letter of January 30, 2015, suggests the University's Board of Trustees may play some role in the dismissal of a faculty member (it says discipline "shall become effective at the time of approval by the University's Board of Trustees"). However, nothing in the Report, the Faculty Handbook, the Faculty Statutes, the Contract, or any other authoritative documents in the record indicates that the Board of Trustees had any role in Dr. McAdams' suspension or dismissal. Nor does the Discipline Letter, authored by President Lovell, mention any role for the Board of Trustees. Indeed, with respect to imposition of the sanctions, the letter speaks exclusively in the first person, indicating President Lovell's understanding that disciplinary authority lies exclusively with him.

[16] We offer this caveat because the Discipline Procedure does not explicitly determine the order of events. For instance, Faculty Statute § 307.07(1) simply says the FHC is "the advisory body" with respect to suspension of a tenured faculty member. It does not say the contest must be submitted to the FHC, and as discussed above, it has no authority to resolve the contest anyway. And although Article 4, § 1.01.1(1) of the Faculty Handbook says the FHC must comply with the Discipline Procedure, it does not impose a similar requirement on the president. Perhaps that mandate exists in other documents governing the University's procedures, but nothing in the record expressly requires the president to wait until the FHC completes its work before dismissing a tenured faculty member. We have not been asked to opine on this question, and the answer ultimately has no effect on our analysis in this case; the purpose of this aside is to confirm we are not deciding the question.

president's role at all, it does nothing but identify him as the recipient of the FHC's advice.

¶48 The Discipline Procedure is silent with respect to how the president must proceed after receiving the Report. Nor is there any separate set of rules, procedures, or standards that describe what the president must do with the FHC's advice. Based on the material before us, the president may adopt the advice in its entirety, reject it out of hand, pick and choose amongst the findings and conclusions, or add his own. Although the Discipline Letter indicates President Lovell carefully read the Report and adopted the FHC's suspension recommendation, the Discipline Procedure did not require him to do so. Nor is there any rule, procedure, or standard that forbade his sua sponte imposition of the additional conditions that resulted in Dr. McAdams' unending suspension——conditions the FHC had never considered.

¶49 As a matter of process, therefore, there is a hard break between the Discipline Procedure and the actual decision to suspend Dr. McAdams. While the dispute was in the hands of a body that had no authority to resolve it (the FHC), the case was subject to the detailed Discipline Procedure. However, once it reached the actual decision-maker (President Lovell), there were no procedures to govern the decision-making process. The Discipline Procedure does not tell President Lovell how to reach his decision, and nothing in the record before us suggests the president's decision must have any relationship to the FHC's work. As far as the Faculty Statutes and Faculty Handbook are

33

concerned, the president may proceed as if the Report said nothing but that the FHC had completed the Discipline Procedure. Consequently, the efficient cause of Dr. McAdams' suspension without pay was the Discipline Letter, and there is no evidence that it resulted from any prescribed procedure at all. It was the product of President Lovell's exercise of unfettered discretion. Even if we were inclined to defer to the authoritative resolution of Dr. McAdams' case (as opposed to the FHC's Report), there is quite literally nothing to which we could apply an arbitration-style review.

3. The Administrative Agency Deference Doctrine

¶50 The circuit court also said it would defer to the University's decision for the same reasons the judiciary often defers to administrative agency decisions. McAdams, No. 2016CV3396, Order for Summary Judgment, 11. The circuit court cited an Ohio intermediate appellate court for this proposition, which said, in pertinent part: "Even though we . . . are hesitant to equate a private university's hearing powers to that of a statutorily mandated administrative body, we do find rationale and guidance from the standard of review adopted by administrative agencies, especially when the involved parties have bound themselves contractually." Yackshaw v. John Carroll Univ. Bd. of Trs., 624 N.E.2d 225, 228 (Ohio Ct. App. 1993).

¶51 We will not defer to the University's decision under the Yackshaw rationale for two reasons. First, the basis for Yackshaw's analogy no longer obtains in Wisconsin. We recently ended the practice of deferring to an administrative agency's

34

conclusions of law.[17] We decided the practice was unsound in principle, and there is no apparent reason it would become sounder if we resurrected it for use in contract disputes between two private parties.

¶52 Second, Yackshaw's analysis is flawed because it deferred to a dispute resolution process that incorporated several of the fundamental defects discussed above. At John Carroll University the process of dismissing a professor begins with a hearing before the Faculty Board of Review (the "FBR"). See id. at 226-27. Like the FHC here, the FBR is composed of university employees. See id. at 226-28. And like the process we are considering today, the FBR does not actually resolve the disputes it hears. It just makes recommendations to the Board of Trustees. See id. at 226-27. The Yackshaw opinion suggests the Board of Trustees enjoys the same autonomy as the University president in this case. It is not bound by the FBR's recommendation, and there are apparently no rules, procedures, or standards that govern how it actually makes its decision. See id. It could accept, reject, or alter the FBR's work at will. See id. The dispute resolution process described by Yackshaw allowed the Board to exercise unfettered discretion in terminating one of its professors.

---

[17] Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶3, ___ Wis. 2d ___, ___ N.W.2d ___. By "conclusions of law" we mean both the interpretation of the law and the application of that law to the facts of a case. See id., ¶¶3, 108. In this context, deference would include interpretation of the Contract and its application to undisputed facts.

35

¶53 Additionally, Yackshaw's deference appears to have been founded on the court's unwarranted attribution of the non-authoritative FBR's procedures to the authoritative Board of Trustees' decision. It seems the court was especially impressed by the FBR's six-day hearing in which it received forty-five exhibits and heard from fifteen witnesses who together produced a nine-hundred page transcript. So when it said "we find that the university did not deny Yackshaw's procedural rights under his contract," it was presumably referring to the FBR's procedures. See id. at 229. It certainly could not have been referring to the actual decision-maker——the Board of Trustees——whose decision was not subject to any procedural requirements or standards at all. We cannot take guidance from Yackshaw, therefore, because it did not analyze whether a court should defer to a defendant's standard-free assessment of a plaintiff's claims, which is what happened both there and here.

¶54 Yackshaw's value is further weakened by its tendentious rejection of McConnell v. Howard University, 818 F.2d 58 (D.C. Cir. 1987) as an "obscure" case in which the court was preoccupied by questions unrelated to deference.[18] McConnell squarely addressed the same deference proposition at issue in Yackshaw, which in turn is the same argument Marquette University advances here. See McConnell, 818 F.2d at 67-68.

_____

[18] "McConnell seems to be the obscure one. . . . [T]he McConnell court appeared preoccupied, and rightfully so, with the failure of the university to honor the contract." Yackshaw v. John Carroll Univ. Bd. of Trs., 624 N.E.2d 225, 228-29 (Ohio Ct. App. 1993).

36

After thorough consideration, the McConnell court rejected it in terms bordering on exasperation. See id. at 67. Accepting this proposition, it said, would mean that "any Trustees' decision to fire a tenured faculty member is largely unreviewable, with judicial scrutiny limited to a modest inquiry as to whether the Trustees' decision was 'arbitrary,' 'irrational' or infected by improper motivation." Id. It understood that deference in this context would demote tenure from a substantive right to a matter of mere procedure: "Such a reading of the contract renders tenure a virtual nullity. Faculty members like Dr. McConnell would have no real substantive right to continued employment, but only certain procedural rights that must be followed before their appointment may be terminated." Id. This, it said, is "an astonishing concept." Id. We agree.

¶55 The Milwaukee County Circuit Court here nonetheless determined that the administrative agency deference doctrine required it to defer because "[t]he parties' contract incorporates a specialized standard for cause that focuses on issues of professional duties and fitness as a university professor." McAdams, No. 2016CV3396, Order for Summary Judgment, 11. "Professionalism and fitness in the context of a university professor," it said, "are difficult if not impossible issues for a jury to assess." Id. We cannot credit this rationale——judges and juries frequently address themselves to some of the most complex matters in life. When a case presents issues beyond our ken, we turn to expert witnesses. McConnell conclusively answers the circuit court's concern as well:

37

> [W]e do not understand why university affairs are more deserving of judicial deference than the affairs of any other business or profession. Arguably, there might be matters unique to education on which courts are relatively ill equipped to pass judgment. However, this is true in many areas of the law, including, for example, technical, scientific and medical issues. Yet, this lack of expertise does not compel courts to defer to the view of one of the parties in such cases. The parties can supply such specialized knowledge through the use of expert testimony.

McConnell, 818 F.2d at 69.

¶56 If academics are capable of discussing university affairs in their cloisters, there is no reason they cannot do so as experts in our courts. The complexity of a contract's subject matter does not convince us that we must give administrative-agency style deference to one of the disputing parties.

\*

¶57 In sum, we do not defer to the University for contractual reasons because the Contract does not say the Discipline Procedure either substitutes for litigation in our courts or limits our review. We also do not afford arbitration-style deference to the University's decision because the FHC was compositionally biased, the Discipline Procedure did not (and could not) produce an authoritative decision, and the individual with the authority to resolve the dispute was subject to no procedures whatsoever. Finally, we do not defer to the University in the manner we have previously deferred to administrative agencies because that practice is unsound in principle.

¶58 The dissent says we should nonetheless defer to the University, and that failing to do so "renders meaningless a key part of shared governance, reducing the faculty's role in this decisionmaking to nothing." Dissent, ¶173. The author, however, does not identify the key part of shared governance we have rendered meaningless, nor could she. The faculty's authority to share in the University's governance comes from the Faculty Statutes and Faculty Handbook, not some formless notion of what shared governance ought to be. We have taken these authorities as they are, and scrupulously examined their provisions. The faculty's role is what our opinion says it is because that is the arrangement upon which the University and its faculty members have agreed. It is not our place to rewrite their management structure to give the faculty a more muscular

39

role in the University's affairs than they currently have. Because the dissent identified no Faculty Statute or Faculty Handbook provision that we have overlooked or misconstrued, we decline the implicit invitation to disregard what these authorities so plainly say.

### B. Merits of the Suspension Decision

¶59 Dr. McAdams says that publishing his blog post is an act of academic freedom and that the Contract protects him from discipline because of such acts. The circuit court decided this case on cross-motions for summary judgment, which means we apply the same methodology as the circuit court upon review.

¶60 This methodology requires that we first determine whether Dr. McAdams has stated a claim upon which relief can be granted. See Green Spring Farms, 136 Wis. 2d at 315. The University does not argue here that Dr. McAdams has failed to state a claim, and our review confirms that he adequately alleged the existence of an enforceable contract and that each count identifies an alleged failure to abide by the Contract's terms.

¶61 The next step in our summary judgment analysis is to determine whether one of the parties is entitled to judgment as a matter of law.[19] In this case, that determination turns on two

---

[19] See Wis. Stat. § 802.08(2); see also Columbia Propane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶11, 261 Wis. 2d 70, 661 N.W.2d 776 (citing § 802.08(2) (2001-02)). To the extent there are factual disputes, we have accepted the version favorable to the University. We conclude that these minor factual differences are not material because they had no substantive effect on our analysis.

40

issues. The first is whether the doctrine of academic freedom encompasses the publication of Dr. McAdams' blog post. If it does, then we must decide whether the University nonetheless had "discretionary cause" to suspend Dr. McAdams.

### 1. Academic Freedom and the Blog Post

¶62 Although we address ourselves to the concept of "academic freedom," we do so only to the extent necessary to determine whether it reaches Dr. McAdams' blog post. Our analysis is narrowly focused and begins with the definition of "academic freedom" as it appears in the University's Faculty Handbook:

> Academic freedom is prized as essential to Marquette University and to its living growth as a university. Professorial academic freedom is that proper to the scholar-teacher, whose profession is to increase knowledge in himself/herself and in others. As proper to the scholar-teacher, academic freedom is grounded on competence and integrity.
>
> When scholar-teachers carry on their academic lives in educational institutions, integrity requires both respect for the objectives of the institution in which they choose to carry on their academic lives and attention to the task of reevaluating these objectives as a necessary condition of living growth in human institutions.
>
> The University, because it prizes academic freedom, proposes the following safeguards* [footnoting a reference to the AAUP's Statement of Principles of Academic Freedom] to that freedom:
>
> a. The teacher is entitled to full freedom in research and in the publication of results, subject to the adequate performance of his/her other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution.

41

b. The teacher is entitled to freedom in the classroom in discussing his/her subject. This freedom must be integrated with the right of the students not to be victimized and the rights of the institution to have its accepted aims respected.

c. The college or university teacher is a citizen, a member of a learned profession, and an officer of an educational institution. When he/she speaks or writes as a citizen, he/she should be free from institutional censorship or discipline, but his/her special position in the civil community imposes special obligations. As a man/woman of learning and an educational officer, he/she should remember that the public may judge his/her profession and institution by his/her utterances. Hence, he/she should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he/she is not an institutional spokesperson.

Faculty Handbook, III.C. (Rights and Responsibilities, Academic Freedom).

¶63 The University acknowledges this definition came from the American Association of University Professors' 1940 Statement of Principles on Academic Freedom and Tenure (the "1940 Statement").[20] During their arguments, both the University and Dr. McAdams had recourse to that document, as well as to subsequent, AAUP-authored,[21] explanatory documents such as the 1970 Interpretive Comments (the "1970 Comments"). Consequently, we will refer to those sources as necessary to understand the scope of the academic freedom doctrine.

---

[20] The Report said "all [University] faculty members are guaranteed academic freedom, defined in the Faculty Handbook using language taken directly from [AAUP's] groundbreaking 1940 Statement of Principles on Academic Freedom and Tenure."

[21] We refer to the American Association of University Professors as the "AAUP."

42

¶64 The AAUP, which participated as amicus curiae, said the doctrine of academic freedom comprises three elements: teaching; research; and extramural comments. The categories correspond to the separately-lettered paragraphs in the University's definition (see supra Faculty Handbook, III.C.). The University and Dr. McAdams agree that we should understand the blog post as an "extramural comment," a type of expression made in Dr. McAdams' personal, not professorial, capacity. Because the parties agree the blog post is covered by one of the categories of academic freedom, the contest is over whether its contents remove the doctrine's protection.

¶65 The definition of "extramural comment" recognizes that a professor occupies a "special position in the community," one that comes with "special obligations."[22] In the original definition in the 1940 Statement, and in the definition above, these special obligations included the duty to "exercise appropriate restraint," to "show respect for the opinions of others," and to "make every effort to indicate that they are not speaking for the institution."[23] However, the AAUP recognizes that the special obligations "are generally not viewed as

---

[22] American Association of University Professors [hereinafter "AAUP"], Policy Documents and Reports, 1940 Statement of Principles on Academic Freedom and Tenure, with 1970 Interpretive Comments 14 (11th ed. 2014) (available at https://www.aaup.org/file/1940%20Statement.pdf); see also Faculty Handbook, III.C. (Academic Freedom).

[23] See AAUP, Policy Documents and Reports, 1940 Statement of Principles on Academic Freedom and Tenure, with 1970 Interpretive Comments 14 (11th ed. 2014) (available at https://www.aaup.org/file/1940%20Statement.pdf).

binding obligations." The Report, after tracing the evolving nature of these "special obligations," essentially agreed:

> [I]t appears that the nature of the "special obligations" that limit a faculty member's freedom to make extramural statements has changed. It is doubtful that there is any longer a binding obligation to be "accurate" at all times in making such statements, or to "exercise appropriate restraint," or to "show respect for the opinions of others," on pain of dismissal.

¶66 The Report observed that the special obligations now appear to be "'responsibilities to their subject, to their students, to their profession, and to their institution;' the obligation to be clear that they are not speaking for their institution; and the 'particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.'"[24] We will use the University's understanding of "special obligations" in our analysis.

---

[24] The FHC's Report said it took this understanding of "special obligations" from the 1970 Comments. It chose to adopt this interpretation for three reasons:

> First, Marquette's definition of academic freedom is taken essentially verbatim from the 1940 Statement, and there is nothing in the Faculty Handbook that indicates any intent to depart from the 1940 Statement as employed and understood by universities generally. Second, the 1970 Interpretive Comments were approved not just by the AAUP, but by the Association of American Colleges, of which Marquette University is a member. Third, whatever plausibility the conditions had as a limit on extramural freedom in 1940, by 2015, or even by 1980 when Section 307.07 of the Faculty Statutes was adopted, such a constricted view of the freedom to engage in public debate would be far outside the mainstream, and there is no indication that Marquette's administration or faculty view

(continued)

44

¶67 The documents on which both parties rely also provide the analytical structure we are to use in analyzing whether an extramural comment has lost the protection of the academic freedom doctrine. It is a two-step process, in which the first determines whether the comment itself demonstrates the faculty member is clearly unfit to serve: "The controlling principle is that a faculty member's expression of opinion as a citizen cannot constitute grounds for dismissal unless it clearly demonstrates the faculty member's unfitness for his or her position."[25] If the comment meets this standard, the second part of the analysis considers the broader context of the faculty member's complete record before deciding whether the extramural comment is protected by the doctrine of academic freedom: "[A] final decision should take into account the faculty member's

_____

Marquette's adoption of the norms of academic freedom as atypical.

At least one other court has used the AAUP's subsequent publications to interpret and limit the reach and effect of the special obligations. See Adamian v. Jacobsen, 523 F.2d 929, 935 (9th Cir. 1975) ("That the University has adopted the Statement of Principles virtually word for word suggests that it also accepts the narrowing interpretation placed on it by the Association.").

[25] AAUP, Policy Documents and Reports, 1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments 15 n.6 (11th ed. 2014) (available at https://www.aaup.org/file/1940%20Statement.pdf) (internal quotation mark omitted) (quoting AAUP, Policy Documents and Reports, Committee A Statement on Extramural Utterances 31 (11th ed. 2014)).

entire record as a teacher and scholar."[26] The Report demonstrates the FHC adopted this analytical structure.

¶68 The University's briefing, however, introduced two problematic aspects to the analysis. First, the University failed to limit the initial inquiry to a consideration of what the blog post, on its face, says about Dr. McAdams' fitness to serve as a professor. Whereas the FHC-endorsed structure begins with a tight focus on the relationship between the comment (and only the comment) and the professor's fitness, the University now says the question is whether the extramural comments "clearly demonstrate the faculty member's unfitness for their position considering their entire record as a teacher and scholar." Although the University's formulation properly recites the two elements of the analysis, it flattens the inquiry into one step. And in doing so, it expanded the initial step so broadly that it subsumed the entire analysis. It is important to keep the two parts of the analysis separate because the first step serves the critically important function of keeping our focus where it belongs——on the extramural comment itself. The AAUP says this step provides a stringent standard of proof for dismissal. So strict, in fact, that "[e]xtramural utterances rarely bear upon the faculty member's fitness for the position."[27]

---

[26] Id.

[27] Id.

¶69 The University introduced a second problematic aspect to the analysis when it uncoupled the doctrine of academic freedom from any stable reference points. The University posited that educational institutions assume academic freedom is just one value that must be balanced against "other values core to their mission." Some of those values, it says, include the obligation to "take care not to cause harm, directly or indirectly, to members of the university community," "to respect the dignity of others and to acknowledge their right to express differing opinions," to "safeguard[] the conditions for the community to exist," to "ensur[e] colleagues feel free to explore undeveloped ideas," and to carry out "the concept of cura personalis," which involves working and caring "for all aspects of the lives of the members of the institution." These are worthy aspirations, and they reflect well on the University. But they contain insufficiently certain standards by which a professor's compliance may be measured. Setting the doctrine of academic freedom adrift amongst these competing values would deprive the doctrine of its instructive power; it would provide faculty members with little to no guidance on what it covers.

¶70 Combined, these two problematic aspects allow the University to use any extramural comment as an excuse to reconsider a faculty member's association with the institution, which is what occurred here. The University's analysis did not begin with an inquiry into whether the blog post, on its face, is so egregious that it clearly demonstrates that Dr. McAdams is unfit to serve as a professor. Instead, it used the extramural

47

comment merely as a key to open a door onto a broad vista of considerations in which it compared the professor's entire career and person against the University's mission to care "for all aspects of the lives of the members of the institution." The extramural comment is not supposed to be a key to other materials the University may wish to place in the "unfitness" balance. The extramural comment goes in the balance alone. Only if the balance clearly tips to "unfitness" may the University then proceed to a comprehensive review of Dr. McAdams' career.

¶71 On the other hand, the analytical structure described by the AAUP, and adopted by the FHC, provides a stable framework within which to evaluate whether the doctrine of academic freedom protects a specific extramural comment. Although the doctrine may not be susceptible to precise definition, still it is sufficiently certain that it can inform faculty members what is required of them.[28] The AAUP properly limits the analysis to whether the actual extramural comment, on its face, clearly demonstrates that the professor is unfit to serve. This very narrow inquiry explains why the AAUP can confidently state that "[e]xtramural utterances rarely bear upon the faculty member's fitness for the position."[29] If we adopted the alternative

---

[28] See _Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co._, 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996) ("[A] contract must be definite as to the parties' basic commitments and obligations.").

[29] See _supra_ n.25.

48

structure now favored by the University, academic freedom would be nothing but a subjective, post-hoc analysis of what the institution might find unacceptable after watching how events unfolded. And this would likely chill extramural comments to the point of extinction. It would be a fearless professor indeed who would risk such a comment, knowing that it licenses the University to scrutinize his entire career and assay it against the care of "all aspects of the lives of the members of the institution."

¶72 The defects inherent in the University's alternative analytical structure, however, represent just one of two problems with its assessment. The second is that the University conducted the analysis backwards. With the benefit of hindsight, the University reverse-engineered its conclusion that Dr. McAdams is a plainly unfit professor because of unknown third parties' reactions to his blog post. The blog post caused "harm," the University said, in the form of critical, sometimes vile, sometimes violently-worded, responses sent to Instructor Abbate after the story had received national attention. Its "unfitness" analysis proceeded as follows: Instructor Abbate suffered harm because she received offensive communications from third parties; the communications were prompted by Dr. McAdams' blog post (directly or indirectly); Dr. McAdams has a responsibility not to harm his students; a professor is unfit to serve if he violates his responsibilities to the University's students. Quod erat demonstrandum. But the University can

49

reach this conclusion only because its analysis traveled in reverse. So quod _non_ erat demonstrandum.

¶73 Performing the analysis in the correct direction leads to the unavoidable conclusion that the blog post has nothing relevant to say about Dr. McAdams' fitness as a professor. The University's end point is where we start——that is, we consider first whether the challenged extramural comment, on its face, violated Dr. McAdams' "responsibilities to . . . [the University's] students." Although Instructor Abbate was functioning as a University instructor, we will consider only her status as a student for purposes of this analysis. The University identified several aspects of the blog post that it believes were problematic. For instance, it says Dr. McAdams relied on improperly obtained information (the surreptitious recording of the conversation between Instructor Abbate and the student); he identified Instructor Abbate by name; he linked to her contact information; he drafted the post in a way that would subject Instructor Abbate to public contempt; and the post contains factual errors.

¶74 The undisputed facts show that none of the aspects of the blog post about which the University is concerned could have violated Dr. McAdams' responsibility to Instructor Abbate. The FHC's Report acknowledged that there is no prohibition against naming a student in a blog post. Nor is it improper for a faculty member to link to a student's personal webpage, even when that webpage lists the student's contact information. The Report acknowledged this is still true even when the blog post

50

is critical of the student. Nor do blogging faculty members have a general obligation to ensure every statement they make in a post is accurate.[30]

¶75 The Report reflects significant discomfort with the surreptitious recording the student made of his interaction with Instructor Abbate and the recording's role in relation to the blog post. But the University does not claim that Dr. McAdams' instigated the recording; its concern, apparently, is that he listened to it and subsequently distributed it to other media outlets. However, the University identified no law or University rule that prohibited the student from making the recording, or forbade Dr. McAdams from reviewing or distributing it once made. Ultimately, the recording is not even material to the dispute——Dr. McAdams could have written the blog post without the recording because the student himself related the event to him. It may be distasteful for students to secretly record their instructors' conversations, but the question here is whether Dr. McAdams' use of the recording (or relationship to it) violated any responsibilities he owed to Instructor Abbate. The University has not identified any, so the recording can have no bearing on this inquiry.

¶76 Finally, there is the University's assertion that Dr. McAdams drafted the blog post in such a way that it would subject Instructor Abbate to public contempt. The blog post is

---

[30] Although the University takes issue with the accuracy of some of the blog post's factual statements, it does not suggest that any of the inaccuracies are legally actionable.

51

certainly critical of her, so one could reasonably foresee that it would engender critical responses. We do not understand the University to argue that an extramural comment that causes such responses is beyond the pale——an extraordinarily unusual argument for an educational institution to make——so we perceive its concern to be about the responses that go beyond the realm of reasonable criticism. But the University did not identify any aspect of what Dr. McAdams actually wrote to support its charge. Instead, it used third-party responses to the blog post as a proxy for its allegedly contempt-inducing nature. Here again, the University demonstrates that reverse-engineering a conclusion is not the most reliable method of conducting an analysis. In this instance, the University caught itself up in the "post hoc ergo propter hoc" fallacy. Just because vile commentary followed the blog post does not mean the blog post instigated or invited the vileness. The University must identify which part of the blog post is supposed to have been responsible for eliciting the offensive remarks. It did not even attempt to do so. Our review of the blog post reveals that it makes no ad hominem attack on Instructor Abbate, nor does it invite readers to be uncivil to her, either explicitly or implicitly. Because the University's logical fallacy represents the entirety of its assertion that Dr. McAdams wrote the blog post to subject Instructor Abbate to contempt, we must reject it.

*

¶77 We conclude that Dr. McAdams' blog post qualifies as an extramural comment protected by the doctrine of academic freedom. The post is incapable of clearly demonstrating Dr. McAdams is unfit to serve as a professor because, although the University identified many aspects of the blog post about which it was concerned, it did not identify any particular way in which the blog post violated Dr. McAdams' responsibilities to the institution's students. Consequently, the blog post retains the protection it presumptively enjoyed as an extramural comment.

## 2. Breach and Remedy

¶78 Because the doctrine of academic freedom protects the blog post, we must now determine whether the University breached the Contract when it suspended Dr. McAdams. Although nothing in the record imposes any procedural restrictions on President Lovell's authority to suspend or dismiss Dr. McAdams, he is nonetheless subject to the Contract's substantive restrictions. Chief amongst these is the promise that a professor may not be suspended or dismissed without cause: "The cognizant appointing authority of the University may initiate and execute procedures by which a faculty member's reappointment may be denied or revoked, or any current appointment may be suspended or terminated, for cause as defined therein." Faculty Statute § 306.01; see also Faculty Statute § 307.07(2) ("A faculty member who has been awarded tenure at Marquette University may

53

only be dismissed upon a showing of absolute or discretionary cause, . . . .").

¶79 "Cause" comes in two varieties: absolute and discretionary. Faculty Statute § 306.01 ("Cause may be either absolute or discretionary."). Dean Holz's letter of January 30, 2015, which commenced the Discipline Procedure, said the University was proceeding under the latter. Discretionary cause includes:

> [T]hose circumstances, exclusive of absolute cause, which arise from a faculty member's conduct and which clearly and substantially fail to meet the standard of personal and professional excellence which generally characterizes University faculties, but only if through this conduct a faculty member's value will probably be substantially impaired. Examples of conduct that substantially impair the value or utility of a faculty member are: serious instances of illegal, immoral, dishonorable, irresponsible, or incompetent conduct.

Faculty Statute § 306.03.

¶80 But discretionary cause cannot include activity encompassed by the doctrine of academic freedom: "In no case, however, shall discretionary cause be interpreted so as to impair the full and free enjoyment of legitimate personal or academic freedoms of thought, doctrine, discourse, association, advocacy, or action." Faculty Statute § 306.03. The University is subject to additional restrictions if the discipline includes dismissal: "Dismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights guaranteed them by the United States Constitution." Faculty Statute § 307.07(2).

54

¶81 There can be no genuine dispute that the University commenced proceedings against Dr. McAdams because of his blog post of November 9, 2014. Dean Holz's letter of January 30, 2015, identified the blog post as the offense for which the University sought the revocation of Dr. McAdams' tenure and his dismissal from the faculty.[31] The letter identified the date of the offense as November 9, 2014, and elaborated, in pertinent part, as follows:

> On November 9, 2014, you chose to post on the Internet a story prompted by a secretly-taped conversation between a student and a graduate student instructor. While you left the undergraduate student's name out of your post, and later insisted that his anonymity be protected, you posted without permission the graduate student instructor's name, Ms. Cheryl Abbate.

The decision to write and publish the blog post, Dean Holz concluded, proved that Dr. McAdams' "conduct clearly and substantially fails to meet the standards of personal and professional excellence that generally characterizes University faculties. As a result, your value to this academic institution is substantially impaired."

---

[31] The University must give formal notice that it is commencing disciplinary proceedings; the notice must contain a detailed description of the offense for which the University seeks to impose discipline. Faculty Statute § 307.03 ("The notice shall include: . . . [t]he statute allegedly violated; the date of the alleged violation; the location of the alleged violation; a sufficiently detailed description of the facts constituting the violation including the names of the witnesses against the faculty member.").

¶82 Upon completion of the FHC's proceedings, the Report recommended discipline based on the blog post:

> Dr. McAdams's conduct, however, goes beyond simply making factual errors in a blog post, or publicly naming a graduate student in the course of criticism, or linking to a page with her contact information, or publicly presenting a one-sided criticism of the teaching of a colleague. It goes beyond posting an extramural blog post that is uncivil, assuming his Nov. 9 blog post could fairly be characterized as uncivil in some way. Instead, Dr. McAdams used improperly obtained information in a way that he should have known could lead to harm, harm that could easily have been avoided. His use of a surreptitious recording, along with Ms. Abbate's name and contact information, to hold Ms. Abbate up for public contempt on his blog, recklessly exposed her to the foreseeable harm that she suffered due to Dr. McAdams's actions. Dr. McAdams's irresponsible behavior in using the recording in this way fell far short of his obligations to Ms. Abbate as a professional colleague and as a fellow member of the Marquette community. We find that such seriously irresponsible conduct clearly and substantially fails to meet the standard of professional excellence that generally characterizes university faculties, although not, as we explain in Subsection V.A.4 below, to the degree necessary to support a penalty of dismissal.

¶83 The Discipline Letter, in which President Lovell detailed his decision to accept the FHC's recommendation, made it clear that Dr. McAdams was being sanctioned for his blog post. President Lovell said, "I found that the Faculty Hearing Committee's written statements . . . unequivocally summarize why you should be seriously reprimanded for your actions," following which he reproduced the Report's conclusion that we excerpted immediately above.

¶84 The blog post, however, is a contractually-disqualified basis for discipline. Discretionary cause cannot

include anything that would "impair the full and free enjoyment of legitimate personal or academic freedoms of thought, doctrine, discourse, association, advocacy, or action." See Faculty Statute § 306.03. Suspending Dr. McAdams for publishing the blog post would, of course, "impair" his "full and free enjoyment of . . . academic freedoms." See id.

¶85 Beginning with the inception of the Discipline Procedure, and ending with President Lovell's decision to suspend Dr. McAdams, the basis for the University's actions has been the blog post. The dissent says we neglected to consider other "key" facts in determining whether the University breached the Contract, such as Dr. McAdams' efforts to bring his blog post to national attention (with the attendant negative responses directed at Instructor Abbate). Dissent, ¶142. This is not a key fact, and neither are any of the others the dissent identifies. All of them are derivative of the blog post, and for that reason they cannot stand as an alternative, independent basis for the suspension decision. Therefore, the University had no justifiable cause to suspend Dr. McAdams on December 16, 2014, affirm the suspension on January 30, 2015, or increase the discipline to suspension without pay effective April 1, 2016. We conclude the University breached the Contract when it took these decisions.

¶86 The dissent believes there is more to the analysis and that we have stopped prematurely. It says "[t]he majority errs in conducting only half of the academic freedom analysis. It fails to recognize, much less analyze, the academic freedom of

57

Marquette as a private, Catholic, Jesuit university." Id.,
¶140. The author observes that "[a]cademic freedom thrives not
only on the independent and uninhibited exchange of ideas among
teachers and students, but also . . . on autonomous
decisionmaking by the academy itself." Id., ¶138 (omission in
original) (quoting Regents of Univ. of Mich. v. Ewing, 474
U.S. 214, 226 n.12 (1985) (internal citations omitted)).

¶87 Much of the dissent, if not most, comprises a
fetchingly poetic ode to the importance of the University's
academic freedom in immanentizing its mission. The problem with
odes, however, is that their poetry so often comes at the
expense of precision. Here, the imprecision resulted in the
misapplication of one of the principles wrapped up in the
concept of institutional academic freedom. The dissent is aware
of it, but addressed it only in passing: "The term 'academic
freedom' is used to denote both the freedom of the academic
institution to pursue its ends without interference from the
government, as well as the freedom of the individual teacher to
pursue desired ends without interference from the institution."
See dissent, ¶148 (emphasis added).

¶88 A university's academic freedom is a shield against
governmental interference; the dissent, however, would reforge
it as a sword with which to strike down contracts it no longer
wishes to honor. But none of the cases on which the dissent
relies convert this pacific principle into such a destructive
tool. The dissent says that part of an institution's academic
freedom is the right "to determine for itself on academic

58

grounds who may teach." <u>Id.</u>, ¶153 (quoting <u>Sweezy v. N.H. by Wyman</u>, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring)).[32] That is true, as far as it goes——but it does not go far enough to address the circumstances here. When the decision to hire is complete, the relationship is no longer a simple matter of academic compatibility. The employment contract adds a legally enforceable aspect to the relationship. An aspect, we would do well to remember, that the Faculty Statutes invite us to adjudicate.

¶89 Operationalizing the dissent's ode would have disastrous consequences for academic freedom. The outward-facing protection against governmental interference would turn inward, pitting the institution's academic freedom against the faculty's academic freedom. The result would be a never-ending pitched battle in which each side tries to expand its own sphere of academic freedom at the expense of the other. That reimagining of this doctrine has no support in the Contract, the Faculty Statutes, the Faculty Handbook, or our cases. And there is probably no better way of ending the University's carefully balanced shared governance than turning a cooperative relationship into an adversarial contest. Therefore, we decline the dissent's invitation to consider whether the University may excuse its breach of the Contract as an exercise of its academic freedom.

---

[32] <u>See also</u> <u>Feldman v. Ho</u>, 171 F.3d 494, 495-96 (7th Cir. 1999) (recognizing educational institution's right to not offer a contract of employment).

*

¶90 There remains the question of Dr. McAdams' remedy for the University's breach of the Contract. The parties disagree with respect to his current status—the University says he is suspended; Dr. McAdams says the suspension has turned into a de facto dismissal. The difference depends on the effect of a certain condition President Lovell included in the Discipline Letter. The letter says Dr. McAdams may not return to the faculty until he submits a letter to the University (to be shared with Instructor Abbate) no later than April 4, 2016, that includes:

- Your [Dr. McAdams'] acknowledgement and acceptance of the unanimous judgment of the peers who served on the Faculty Hearing Committee.

  . . . .

- Your acknowledgement that your November 9, 2014, blog post was reckless and incompatible with the mission and values of Marquette University and you express deep regret for the harm suffered by our former graduate student and instructor, Ms. Abbate.

Dr. McAdams says this condition creates a de facto dismissal because it requires, at least in part, that he recant activity protected by the doctrine of academic freedom. The University claims these are reasonable pre-conditions to the resumption of professorial duties in light of the basis for his sanction.

¶91 Dr. McAdams did not write the missive required by the Discipline Letter. Nonetheless, the University confirmed he was still suspended—not dismissed—even after expiration of the deadline stated in the Discipline Letter. On April 13, 2016, President Lovell wrote to Dr. McAdams "to clarify that your

60

status with the University is unchanged and you remain in a suspended status as outlined in my March 24th letter." The University's brief also acknowledges Dr. McAdams has not been terminated. It wrote: "Dr. McAdams argues in a footnote . . . that his continued suspension is a de facto termination. But the conditions for his return were appropriate according to his own expert and Judge Hansher, and his refusal to do what is appropriate <u>does not constitute a termination by Marquette</u>." (Emphasis added.) Nothing in the record indicates his status has changed since then.

¶92 We will accept the University's concession that it has not dismissed Dr. McAdams and that he has merely been suspended from his status as a tenured member of the Marquette University faculty (without pay). Because we have concluded that the suspension breached the Contract, it must be ended and Dr. McAdams must be restored to the faculty. The Faculty Statutes require the University to comply with our determination of Dr. McAdams' right to reinstatement:

> [T]he University shall, for a period of six months thereafter, or until the final determination of any judicial action which may be commenced within such period to test the validity of the . . . suspension, . . . hold itself ready to reinstate the faculty member, with unimpaired rank, tenure, compensation, and benefits, to the extent that the faculty member's entitlement thereto may be judicially adjudged or decreed, . . . .

61

Faculty Statute § 307.09.[33]

¶93 Therefore, we hold the University to its contractual promise to reinstate Dr. McAdams to the faculty of Marquette University with unimpaired rank, tenure, compensation, and benefits. See Ash Park, LLC v. Alexander & Bishop, Ltd., 2010 WI 44, ¶37, 324 Wis. 2d 703, 783 N.W.2d 294 ("When a contract specifies remedies available for breach of contract, the intention of the parties generally governs."); Faculty Statute § 307.09. Because the suspension was invalid ab initio, the University may not enforce any of the reinstatement conditions identified in the Discipline Letter.[34]

## V. CONCLUSION

¶94 We do not defer to the University's determination that it did not breach its Contract with Dr. McAdams. The

---

[33] Dr. McAdams filed his complaint to "test the validity of" his suspension, and we have concluded the suspension was not valid. Further, he filed his complaint within the time required by Faculty Statute § 307.09. He commenced this case on May 2, 2016, with the filing of his complaint in the Milwaukee County Circuit Court, which is within six months of the Discipline Letter. See Wis. Stat. § 801.02(1) ("A civil action in which a personal judgment is sought is commenced as to any defendant when a summons and a complaint naming the person as defendant are filed with the court, . . . ."). The six-month window commenced with President Lovell's issuance of the Discipline Letter on March 24, 2016, because that is the document that imposed the discipline under consideration in this case.

[34] Because we base our conclusion on the University's concession that Dr. McAdams has not been dismissed, we do not address whether the University violated its promise that "[d]ismissal will not be used to restrain faculty members in their exercise of . . . rights guaranteed them by the United States Constitution." Faculty Statute § 307.07(2).

62

University's Discipline Procedure neither substitutes for, nor limits, Dr. McAdams' right to litigate his claims in our courts.

¶95 We conclude that the University breached the Contract by suspending Dr. McAdams for exercising his contractually-protected right of academic freedom.[35] Consequently, we reverse the circuit court's order and judgment, and remand with instructions to:

> (1) Enter judgment in favor of Dr. McAdams on his claims that the University breached the Contract by suspending him without cause on December 16, 2014 (with pay), affirming the suspension on January 30, 2015, and then increasing the discipline to suspension without pay effective April 1, 2016 (Complaint, counts one and two);
>
> (2) Enter an order requiring the University to immediately reinstate Dr. McAdams to the faculty of Marquette University with unimpaired rank, tenure, compensation, and benefits (including the tendering of any documents necessary to accomplish those ends);
>
> (3) Conduct such other and further proceedings as are consistent with this decision, including the determination of Dr. McAdams' damages (which shall include back pay).[36]

*By the Court.*—The judgment and order of the circuit court are reversed, and the cause is remanded with instructions.

¶96 ANNETTE KINGSLAND ZIEGLER, J., did not participate.

---

[35] Both the concurring and dissenting opinions address what the First Amendment to the United States Constitution might have to say about this case. The court, however, does not rely upon the United States Constitution for any part of its decision.

[36] We express no opinion on the merits of any part of Dr. McAdams' complaint except as expressly addressed herein.

63

# MARQUETTE WARRIOR

WE ARE HERE TO PROVIDE AN INDEPENDENT, RATHER SKEPTICAL VIEW OF EVENTS AT MARQUETTE UNIVERSITY. COMMENTS ARE ENABLED ON MOST POSTS, BUT EXTENDED COMMENTS ARE WELCOME AND CAN BE E-MAILED TO JMCADAMS2@JUNO.COM. E-MAILED COMMENTS WILL BE TREATED LIKE LETTERS TO THE EDITOR. THIS SITE HAS NO OFFICIAL CONNECTION WITH MARQUETTE UNIVERSITY. INDEED, WHEN UNIVERSITY OFFICIALS FIND OUT ABOUT IT, THEY WILL DOUBTLESS WANT IT SHUT DOWN.

SUNDAY, NOVEMBER 09, 2014

## Marquette Philosophy Instructor: "Gay Rights" Can't Be Discussed in Class Since Any Disagreement Would Offend Gay Students

[MATERIAL REDACTED]

A student we know was in a philosophy class ("Theory of Ethics"), and the instructor (one Cheryl Abbate) was attempting to apply a philosophical text to modern political controversies. So far so good.

She listed some issues on the board, and came to "gay rights." She then irily said that "everybody agrees on this, and there is no need to discuss it."

The student, a conservative who disagrees with some of the gay lobby's notions of "gay rights" (such as gay marriage) approached her after class and told her he thought the issue deserved to be discussed. Indeed, he told Abbate that if she dismisses an entire argument because of her personal views, that sets a terrible precedent for the class.

The student argued against gay marriage and gay adoption, and for a while, Abbate made some plausible arguments to the student — pointing out that single people can adopt a child, so why not a gay couple? She even asked the student for research showing that children of gay parents do worse than children of straight, married parents. The student said he would provide it.

So far, this is the sort of argument that ought to happen in academia.

ut then things deteriorated.

**Certain Opinions Banned**

EXHIBIT
A1

MU-000073

66-4

1

Abbate explained that "some opinions are not appropriate, such as *racist opinions, sexist opinions*" and then went on to ask "do you know if anyone in your class is homosexual?" And further "don't you think it would be offensive to them" if some student raised his hand and challenged gay marriage? The point being, apparently that any gay classmates should not be subjected to hearing any disagreement with their presumed policy views.

Then things deteriorated further as the student said that it was his right as an American citizen to make arguments against gay marriage. Abbate replied that "you don't have a right in this class to make homophobic comments."

She further said she would "take offense" if the student said that women can't serve in particular roles. And she added that somebody who is homosexual would experience similar offense if somebody opposed gay marriage in class.

She went on "In this class, homophobic comments, racist comments, will not be tolerated." She then invited the student to drop the class.

Which the student is doing.

## Shutting People Up

Abbate, of course, was just using a tactic typical among liberals now. Opinions with which they disagree are not merely wrong, and are not to be argued against on their merits, but are deemed "offensive" and need to be shut up.

As Charles Krauthammer explained:

> The proper word for that attitude is totalitarian. It declares certain controversies over and visits serious consequences -- from social ostracism to vocational defenestration -- upon those who refuse to be silenced.

> The newest closing of the leftist mind is on gay marriage. Just as the science of global warming is settled, so, it seems, are the moral and philosophical merits of gay marriage.

> To oppose it is nothing but bigotry, akin to racism. Opponents are to be similarly marginalized and shunned, destroyed personally and professionally.

Of course, only certain groups have the privilege of shutting up debate. Things thought to be "offensive" to gays, blacks, women and so on must

[MATERIAL REDACTED]

MU-000074

66-5

2

[MATERIAL REDACTED]

be stifled. Further, it's not considered necessary to actually find out what the group really thinks. "Women" are supposed to feel warred upon when somebody opposes abortion, but in he real world men and women are equally likely to oppose abortion.

The same is true of Obama's contraception mandate.

But in the politically correct world of academia, one is supposed to assume that all victim groups think the same way as leftist professors.

## The "Offended" Card

Groups not favored by leftist professors, of course, can be freely attacked, and their views (or supposed views) ridiculed. Christians and Muslims are not allowed to be "offended" by pro-gay comments.

(Muslims are a protected victim group in lots of other ways, but not this one.)

And it is a free fire zone where straight white males are concerned.

## Student Seeks Redress

The student first complained to the office of the Dean of Arts & Sciences, and talked to an Associate Dean, one Suzanne Foster. Foster sent the student to the Chair of the Philosophy Department, saying that department chairs usually handle such cases. The chair, Nancy Show, pretty much blew off the issue.

Interestingly, both Snow and Foster have been involved in cases of politically correct attacks on free expression at Marquette.

Foster took offense when one of her colleagues referred to a dinner which happened to involve only female faculty as a "girls night out." He was reprimanded by then department chair James South for "sexism," but the reprimand was overturned by Marquette.

Snow, in a class on the "Philosophy of Crime and Punishment" tried to shut up a student who offered a response, from the perspective of police, to Snow's comments about supposed "racial profiling." The student said talk about racial profiling makes life hard for cops, since it may make minorities hostile and uncooperative.

now tried to silence him, claiming "this is a diverse class." This was an apparent reference to two black students in the class, who were, Snow assumed, likely offended on hearing that.

MU-000075

The majority of the class, contacted by The Marquette Warrior, felt the comments were reasonable and relevant, but Snow insisted that the student write an apology to the black students.

So how is a student to get vindication from University officials who hold the same intolerant views as Abbate?

## Conclusion

Thus the student is dropping the class, and will have to take another Philosophy class in the future.

But this student is rather outspoken and assertive about his beliefs. That puts him among a small minority of Marquette students. How many students, especially in politically correct departments like Philosophy, simply stifle their disagreement, or worse yet get indoctrinated into the views of the instructor, since those are the only ideas allowed, and no alternative views are aired?

Like the rest of academia, Marquette is less and less a real university. And when gay marriage cannot be discussed, certainly not a Catholic university.

Labels: Cheryl Abbate, Gay Marriage, Intolerance, Leftist Intolerance, Leftist Professors, Liberal Intolerance, Marquette, Nancy Snow, Philosophy Department, Political Correctness, Suzanne Foster

POSTED BY JOHN MCADAMS AT 6:06 PM

36 COMMENTS

[MATERIAL REDACTED]

[COMMENTS REDACTED]

MU-000076

66-7

4

¶97 REBECCA GRASSL BRADLEY, J. *(concurring)*. In this unprecedented dispute between a university and a professor, academic freedom was put on trial. Would the sacred "right of faculty members to speak as citizens——that is, 'to address the larger community with regard to any matter of social, political, economic or other interest without institutional discipline or restraint'"[1]——succumb to the dominant academic culture of micro-aggressions, trigger warnings and safe spaces[2] that seeks to silence unpopular speech by deceptively recasting it as violence? In this battle, only one could prevail, for academic freedom cannot coexist with Orwellian speech police. Academic freedom means nothing if faculty is forced to self-censor in fear of offending the unforeseen and ever-evolving sensitivities of adversaries demanding retribution.

¶98 "[T]he peculiar evil of silencing the expression of an opinion is . . . robbing the human race; posterity as well as the existing generation; those who dissent from the opinion,

---

[1] American Association of University Professors, Statement on Civility, https://www.aaup.org/issues/civility (last visited June 18, 2018).

[2] Some universities recognize the incompatibility of insulating students from micro-aggressions, via trigger warnings and safe spaces, with academic freedom: "Our commitment to academic freedom means that we do not support so-called 'trigger warnings,' we do not cancel invited speakers because their topics might prove controversial, and we do not condone the creation of intellectual 'safe spaces' where individuals can retreat from ideas and perspectives at odds with their own." John Ellison, Dean of Students at the University of Chicago, Letter to Class of 2020, https://news.uchicago.edu/sites/default/files/attachments/Dear_Class_of_2020_Students.pdf (last visited June 18, 2018).

still more than those who hold it. If the opinion is right, they are deprived of the opportunity of exchanging error for truth: if wrong, they lose, what is almost as great a benefit, the clearer perception and livelier impression of truth, produced by its collision with error."[3] Many American universities were founded "on the illimitable freedom of the human mind" to develop, articulate, examine and communicate ideas in order to "follow truth wherever it may lead."[4] Marquette University's own mission includes "the search for truth, the discovery and sharing of knowledge."[5] When academic freedom was under attack for being "dangerous" and "oppressive" forty years ago, one of America's oldest universities reaffirmed that "[t]he history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable."[6] Over time, academia has begun to abandon this

---

[3] John Stuart Mills, On Liberty, in Utilitarianism and On Liberty 88, 100 (Mary Warnock ed., 2d ed. 2003) (1859).

[4] Thomas Jefferson, University of Virginia, Comprehensive Standards 3.7.4: Academic Freedom, http://www.virginia.edu/sacs/standards/3-7-4.html (last visited June 18, 2018).

[5] Marquette University, Mission Statement, http://www.marquette.edu/leadership/values.php (last visited June 18, 2018).

[6] Yale University, 1974 Report of the Committee on Freedom of Expression at Yale, https://yalecollege.yale.edu/deans-office/reports/report-committee-freedom-expression-yale (last visited June 18, 2018).

Jeffersonian creed,[7] replacing it with groupthink tribalism seeking to silence disfavored viewpoints.[8]

¶99 I join the majority in full. The opinion ably addresses academic freedom in a manner narrowly tailored to this case, which was easily resolved by applying the language of Marquette's contract with McAdams to the undisputed facts. The court correctly concludes that the contract guarantees McAdams academic freedom, academic freedom encompasses his blog post, and Marquette's suspension of McAdams breached the contract.

¶100 I write separately because academic freedom, and concomitantly, free speech, is increasingly imperiled in America and within the microcosm of the college campus. A broader discussion of the significance and meaning of academic freedom will benefit universities who contractually extend academic freedom to professors, as Marquette did, as well as courts across the nation tackling these issues.

I

¶101 The United States Supreme Court has discussed the importance of academic freedom in a variety of cases, but has not definitively expounded its meaning. In Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967), the Court described academic

---

[7] See Bradley Campbell & Jason Manning, The End of Academe: Free Speech and the Silencing of Dissent, Chron. of Higher Educ. (Jan. 21, 2018), https://www.chronicle.com/article/The-End-of-Academe-Free/242290.

[8] See Daniel B. Klein & Charlotta Stern, Groupthink in Academia, Am. Enterprise Inst. (Nov. 14, 2007), https://www.aei.org/wp-content/uploads/2011/10/20071113_GroupthinkinAcademia.pdf.

3

freedom as being "of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." See also Shelton v. Tucker, 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."); Barenblatt v. United States, 360 U.S. 109, 112 (1959) (describing "academic teaching-freedom and its corollary learning-freedom" as "so essential to the well-being of the Nation); Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957) (plurality) ("The essentiality of freedom in the community of American universities is almost self-evident . . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.").

¶102 Specific definitions can be found in other authoritative sources. Black's Law Dictionary defines academic freedom as "the right (esp. of a university teacher) to speak freely about political or ideological issues without fear of loss of position or other reprisal."[9] The American Association of University Professors (AAUP) defines academic freedom as the liberty to "speak or write as citizens . . . free from

---

[9] Academic Freedom, Black's Law Dictionary (10th ed. 2014).

4

institutional censorship or discipline."[10] Russell Kirk described academic freedom as a principle that teachers and scholars should be "protect[ed] . . . from hazards that tend to prevent [them] from meeting [their] obligations in the pursuit of truth."[11]

¶103 The roots of academic freedom are ancient. Dr. Martin Luther King Jr. attributed the concept's origin to Socrates. See Martin Luther King, Jr., Letter from Birmingham Jail (Apr. 16, 1963), in The Autobiography of Martin Luther King, Jr. 187, 194 (Clayborne Carson ed., 1998). The search for truth to which the founder of the first academy, Plato, was dedicated, has been identified as the progenitor of academic freedom. Larry D. Spurgeon, A Transcendent Value: The Quest to Safeguard Academic Freedom, 34 J.C. & U.L 111, 117 (2007). The modern

---

[10] American Association of University Professors, 1940 Statement of Principles on Academic Freedom and Tenure, https://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure (last visited June 18, 2018). The AAUP, founded in 1915, is a non-profit organization representing the interests of over 40,000 faculty, librarians, graduate students, and academic professionals at institutions of higher learning across the country. AAUP appears as amicus in this case in support of McAdams and declares it "is committed to advancing academic freedom, the free exchange of ideas, and higher education's contribution to the common good." As the first organization to develop codes of academic freedom, AAUP's statements remain the model. Julie H. Margetta, Taking Academic Freedom Back to the Future: Refining the "Special Concern of the First Amendment", 7 Loy. J. Pub. Int. L. 1, 5 (2005). As the court explains, Marquette does not dispute that it adopted AAUP's 1940 Statement of Principles on Academic Freedom and Tenure. See majority op., ¶¶61-62, n.20.

[11] Russell Kirk, Academic Freedom: An Essay in Definition 1 (1955) (quotation marks omitted).

understanding of academic freedom likely originated in German principles of <u>Lehrfreiheit</u> and <u>Lernfreiheit</u>, the freedom to teach and the freedom to learn, respectively. Julie H. Margetta, <u>Taking Academic Freedom Back to the Future: Refining the "Special Concern of the First Amendment"</u>, 7 Loy. J. Pub. Int. L. 1, 5 (2005). The German conception of academic freedom encompassed students, perhaps a recognition that inhibiting the freedom of teachers impedes learning.

¶104 The concept appears in American history as early as the eighteenth century in Thomas Jefferson's founding vision of the University of Virginia: "This institution will be based on the illimitable freedom of the human mind. For here we are not afraid to follow truth wherever it may lead, nor to tolerate any error so long as reason is left to combat it."[12] Nineteenth century academics did not confine their exercise of academic freedom to the classroom, but understood the principle to protect their "right to express their opinions even outside the walls of academia, even on controversial subjects." Geoffrey R. Stone, <u>A Brief History of Academic Freedom</u>, <u>in</u> <u>Who's Afraid of Academic Freedom?</u> 5 (Akeel Bilgrami & Jonathan R. Cole eds., 2015). Protection of extramural speech——expression beyond the boundaries of the university——endures: "Freedom of extramural

---

[12] University of Virginia, Comprehensive Standards 3.7.4: Academic Freedom, http://www.virginia.edu/sacs/standards/3-7-4.html (last visited June 18, 2018).

utterances is a constitutive part of the American conception of academic freedom."[13]

¶105 Academic freedom encompasses "two distinct concepts": (1) "professional academic freedom" tied to AAUP standards, and (2) the "legal concept of academic freedoms" tied to the First Amendment. Margetta, supra ¶7, at 4-5. Academic freedom has also been expressed as a right under the First Amendment, which in public universities serves as the source for academic freedom. See generally Donald A. Downs, Academic Freedom: What It Is, What It Isn't, and How to Tell the Difference, Pope Ctr. Series on Higher Educ., May 2009, at 1. The AAUP specifically accords extramural statements protections that are coextensive with the First Amendment, noting that a university questioning a professor's fitness should "remove from consideration any supposed rhetorical transgressions that would not be found to exceed the protections of the First Amendment."[14] Academic freedom and free speech are interconnected concepts and frequent companions. I discuss these doctrines synchronously because Marquette guaranteed McAdams both rights and contractually shielded him from discipline for his exercise of either.

---

[13] AAUP, Statement on Civility, https://www.aaup.org/issues/civility (last visited June 18, 2018).

[14] AAUP, Ensuring Academic Freedom in Politically Controversial Academic Personnel Decisions (Aug. 2011), https://www.aaup.org/NR/rdonlyres/895B2C30-29F6-4A88-80B9-FCC4D23CF28B/0/PoliticallyControversialDecisionsreport.pdf.

II

¶106 The United States Supreme Court has repeatedly recognized the importance of academic freedom and freedom of expression on America's college campuses, without which "our civilization will stagnate and die." Sweezy, 354 U.S. at 250. In 1957, the Court noted the "essentiality of freedom in the community of American universities" as "almost self-evident," concluding that "[s]cholarship cannot flourish" unless "[t]eachers and students . . . always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." Id.

¶107 A decade later, the Court affirmed: "Our Nation is deeply committed to safeguarding academic freedom" which is "a special concern of the First Amendment." Keyishian, 385 U.S. at 603 (1967). The role "played by those who guide and train our youth" in America's universities cannot be understated. Id. (quoting Sweezy, 354 U.S. at 250). Public discourse on controversial topics is essential to our success as a nation. Id. "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." Id. (emphasis added).

¶108 In 1972, the Court stressed that the "college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" Healy v. James, 408 U.S. 169, 180 (1972). The Court "reaffirm[ed] this Nation's dedication to safeguarding academic freedom." Id. at 180-81. And, in 2003, it emphasized that "universities occupy a special niche in our

8

constitutional tradition." Grutter v. Bollinger, 539 U.S. 306, 329 (2003).

¶109 This collection of cases establishes the centrality of academic freedom on college campuses, and the judicial branch's responsibility to vigilantly protect it. Several federal appellate courts have acknowledged the right of university professors "to disseminate publicly [their] views as . . . teacher[s] or scholar[s]." Omosegbon v. Wells, 335 F.3d 668, 677 (7th Cir. 2003). Protecting academic freedom is particularly pressing when the views expressed "fall outside the mainstream." Rodriguez v. Maricopa Cty. Cmty. Coll. Dist., 605 F.3d 703, 708 (9th Cir. 2010). "Without the right to stand against society's most strongly-held convictions, the marketplace of ideas would decline into a boutique of the banal, as the urge to censor is greatest where debate is most disquieting and orthodoxy most entrenched." Id.

¶110 For example, a federal district court denied the University of Illinois' motion to dismiss a newly hired professor's breach of contract action against the University for rescinding the contract based on the professor's profanity-laden diatribe against Israel, which he posted on Twitter. Salaita v. Kennedy, 118 F. Supp. 3d 1068, 1075-84 (N.D. Ill. 2015) (classifying professor's personal tweets as a matter of public concern and determining Salaita's complaint sufficiently alleged a First Amendment claim); see also Starsky v. Williams, 353 F. Supp. 900, 922-24, 927 (D. Ariz. 1972), aff'd in part, rev'd in part, 512 F.2d 109 (9th Cir. 1975) (firing professor for

9

participating in a protest and making profane remarks critical of administration violated AAUP standards that prohibit such discipline as well as a First Amendment right to express unpopular views); Adamian v. Jacobsen, 523 F.2d 929, 931, 934 (9th Cir. 1975) (professor who made profane comments, disrupted campus ceremonies, and incited potential violent confrontation during Vietnam and Kent State protest cannot be disciplined for such political agitation; remanded for further proceedings).

¶111 It is the expression of opinions divergent from what is currently politically correct that needs protection under the doctrine of academic freedom. "*If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought——not free thought for those who agree with us but freedom for the thought that we hate.*" United States v. Schwimmer, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting). If academic freedom does not protect dissident viewpoints, the doctrine is worthless. After all, "[i]ntellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." Rodriguez, 605 F.3d at 708.

¶112 Academic freedom, however, is not limitless. Like Marquette, many universities have adopted the AAUP's 1940 Statement of Principles on Academic Freedom and Tenure. With rights come responsibilities and the AAUP guides the exercise of

10

academic freedom in its Statement on Professional Ethics.[15] For example, this ethics code for professors demands the practice of "intellectual honesty," the protection of students' academic freedom, and the avoidance of creating any impression of speaking on behalf of the university.

¶113 Courts have also circumscribed some limits around academic freedom. It does not impede a "university's ability to control its curriculum," Edwards v. Cal. Univ. of Pa., 156 F.3d 488, 491 (3d Cir. 1998), or "to regulate the content of what is or is not expressed" when it is the university that is speaking, Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833-34 (1995).[16] But, the doctrine does preclude universities from punishing academic speakers who publicly discuss matters of public concern beyond the classroom. See Vikram Amar & Alan Brownstein, Academic Freedom, 9 Green Bag 2d 17, 25-26 (2005). Just as no citizen could "be punished for writing a book that angers the state legislature——no matter how outrageous or offensive the book might be," id., professors at universities should not be punished for speaking on matters of

---

[15] AAUP, Statement on Professional Ethics (1966), https://www.aaup.org/report/statement-professional-ethics (last visited June 18, 2018).

[16] Similarly, the First Amendment does not protect all speech. See State v. Breitzman, 2017 WI 100, ¶¶51-54, 378 Wis. 2d 431, 904 N.W.2d 93 (explaining classes of speech not protected).

public concern even if——especially if——that speech does not conform with mainstream thought.[17]

                                    III

¶114 Courts have been "particularly vigilant" when there is an "alleged assault" on the First Amendment involving academic freedom.  Larry D. Spurgeon, A Transcendent Value:  The Quest to Safeguard Academic Freedom, 34 J.C. & U.L 111, 150 (2007) ("A 'special concern' means that courts should be particularly vigilant when an alleged assault on the First Amendment involves academic speech.").  The First Amendment protects speech of university employees when it involves "matters of public concern"——speech that can be "fairly considered as relating to" issues "of political, social, or other concern to the community."[18]  Connick v. Myers, 461 U.S. 138, 146 (1983); see also Pickering v. Bd. of Educ., 391 U.S. 563, 572-73 (1968).[19]

---

[17] The court received a variety of amicus briefs from private businesses concerned about the reverberations of this case on the private sector.  Their fears are unfounded. University campuses inhabit a unique environment.  The doctrine of academic freedom has no application within private enterprise, unless of course a private entity incorporates the doctrine into employee contracts.  Marquette University, although a private institution, chose to guarantee academic freedom to McAdams in his contract.

[18] The text of the First Amendment provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

(continued)

¶115 The Court struck down a West Virginia law compelling all teachers and students to salute the American Flag while pledging allegiance to it and those who refused were expelled from school.  W. Virginia Bd. of Educ. v. Barnette, 319 U.S. 624, 626-30 (1943).  The Court, declaring the law violative of the First Amendment, proclaimed:  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  Id. at 642.

¶116 In Keyishian, the Court nullified New York laws requiring university professors to certify they were not communists.  385 U.S. at 603-04.  Concerned about both academic freedom and the First Amendment, the Court identified the "chilling effect upon the exercise of vital First Amendment rights" when vague and general restrictions cause a teacher to

---

As a private entity, Marquette, of course, is neither Congress nor the government, and can adopt and enforce rules not implicated by the Constitution.  Marquette, however, chose to incorporate into McAdams' contract rights guaranteed "by the United States Constitution."

[19] These two cases are often discussed together in assessing whether speech of a public employee was protected, which is known as the Pickering-Connick test.  But cf. Garcetti v. Ceballos, 547 U.S. 410, 425 (2006) ("[E]xpression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence.").

"guess what conduct or utterance may lose him his position." Id. at 604.

¶117 Similarly, the Court held unconstitutional an Oklahoma law requiring teachers to take a "loyalty oath" disclaiming affiliation "directly or indirectly" with any organization or group determined "to be a communist front or subversive organization." Wieman v. Updegraff, 344 U.S. 183, 186 (1952). The Court held the law infringed individual constitutional rights, was an "assertion of arbitrary power," and offended due process. Id. at 188-91. It recognized that "inhibiting individual freedom of movement" when a teacher may have innocently joined a group would "stifle the flow of democratic expression and controversy at one of its chief sources." Id. at 191.

¶118 Sweezy involved a professor who was convicted for refusing to answer political association questions. 354 U.S. at 238-45. The Court reversed the conviction, emphasizing academic freedom and freedom of expression. Id. at 249-50. Recognizing freedom of expression as a "fundamental principle of democratic society," the Court professed the significance of divergent voices: "Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society." Id. at 251.

¶119 Finally, in Shelton, the Court struck down an Arkansas statute requiring teachers to annually file an affidavit listing "every organization to which [they have] belonged or regularly contributed within the preceding five years." 364 U.S. at 480.

14

The Court held this law abridged teachers' constitutional rights by inhibiting free speech, assembly, and association. Id. at 485-89. "Such unwarranted inhibition upon the free spirit of teachers . . . has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice . . . ." Id. at 487 (quoting Wieman, 344 U.S. at 195 (Frankfurter, J., concurring)).

IV

¶120 In every case presenting the Supreme Court with the issue, it unfailingly declared the importance of academic freedom and freedom of expression in academia. It struck down many laws that undoubtedly had the support of a majority of the people. In the midst of the fear and tension gridlocking American international politics during the Cold War, few would publicly object to ensuring that teachers——entrusted with educating the future leaders of America——would denounce Communism and would not influence students to become Communists. Despite the good intentions underpinning such laws, the Court repeatedly struck them down and continually emphasized the importance of academic freedom, the need for free expression on college campuses, and the significant value that opposing viewpoints play in the advancement of ideas. From Aristotle challenging the then-predominant belief that the Earth was flat to Susan B. Anthony and Elizabeth Cady Stanton asserting the then-preposterous idea that women should vote, the past is replete with examples of unpopular ideas proven right when

freely aired and debated. To squelch discussion of any idea jeopardizes our future.

¶121 Academic freedom exists to further the search for truth through vigorous open inquiry, discourse, and debate. See, e.g., Healy, 408 U.S. at 180. Permitting debate ensures "the security of the Republic, the very foundation of constitutional government." DeJonge v. State of Oregon, 299 U.S. 353, 365 (1937) ("to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means"). And, as Pickering instructs, criticisms of campus administration are part of the public debate. 391 U.S. at 573-74.

¶122 This court acknowledged the importance of academic freedom, specifically the freedom to criticize university administration, almost sixty years ago when it decided State ex rel. Ball v. McPhee, 6 Wis. 2d 190, 94 N.W.2d 711 (1959), overruled in part on other grounds, Stacy v. Ashland Cty. Dep't. of Public Welfare, 39 Wis. 2d 595, 159 N.W.2d 630 (1968). In that case, this court recognized that a university should not be able to discharge a professor on the basis of the professor's expression of philosophical disagreements with administration: "Surely a teacher in a state college is entitled to some academic freedom in criticizing school programs with which he is in disagreement. Such acts of criticism do not qualify as either inefficiency or bad behavior." Id. at 204.

16

V

¶123 Professional academic freedom is often regarded to be "alive and well"[20] as the dearth of court cases may corroborate. News reports of intra-campus clashes between professors and administrators[21] suggest otherwise, although many disputes never reach the courts for obvious reasons, not least among them, "it is always dangerous to shoot at the king."[22]  However, when "there is a breach in the academic fortress . . . the next line of defense, in some instances, is the court."[23]  This is one of those instances.

¶124 McAdams, as he had done many times before, wrote a blog post on a matter of public concern calling into question the prevailing orthodoxy on Marquette's campus.[24]  The impetus for this particular blog post arose after an undergraduate student, J.D., turned to McAdams for help because J.D. was

---

[20] Larry D. Spurgeon, A Transcendent Value:  The Quest to Safeguard Academic Freedom, 34 J.C. & U.L 111, 130 (2007).

[21] Heather MacDonald, The Penn Law School Mob Scores A Victory, Wall St. J. (Mar. 18, 2018), https://www.wsj.com/articles/the-penn-law-school-mob-scores-a-victory-1521397094; Erika Christakis, My Halloween Email Led to a Campus Firestorm, The Wash. Post (Oct. 28, 2016), https://www.washingtonpost.com/opinions/my-halloween-email-led-to-a-campus-firestorm--and-a-troubling-lesson-about-self-censorship/2016/10/28/70e55732-9b97-11e6-a0ed-ab0774c1eaa5_story.html?utm_term=.7fae2361b7d7.

[22] Spurgeon, supra note 20, at 130.

[23] Id.

[24] McAdams has been employed as a professor at Marquette since 1977.  Marquette granted him tenure in 1989.

troubled by how his Philosophy teacher (who was a graduate student), and Marquette's Philosophy Department Chair Nancy Snow and Assistant Chair Sebastian Luft had shut down his attempt to understand why the topic of same sex marriage had been censored during a class discussion. Abbate invited J.D. to drop the class and Snow told him to "change his attitude so he comes across as less insolent and disrespectful," later calling him a "little twit" and a "jackass" in email exchanges with colleagues. Absurdly, Marquette's Faculty Hearing Committee would later support its disciplinary recommendation against McAdams by citing Marquette's Guiding Values, which obligate professors to "respect the dignity of others" to "acknowledge their right to express differing opinions" and to "nurture an inclusive, diverse community that fosters . . . vigorous yet respectful debate."

¶125 McAdams reached out to Abbate for comment, but Abbate declined the opportunity to respond. The blog post reported on the student's experience and discussed McAdams' political view of popular tactics used for "shutting people up." It was critical of Marquette and of censorship. Unlike the Philosophy Department faculty's criticisms of J.D., it did not contain any intemperate language or ad hominem attack. The blog post did not contain a call to action or make any demands inciting violence or attack. In fact, Marquette's Dean of Arts and Sciences did not believe the post was harmful to Abbate at all and Abbate apparently agreed, remarking: "When I saw the blog I was pleasantly surprised."

¶126 Despite her pleasant surprise, Abbate flamed this fire. She drafted a formal letter of complaint insisting that Marquette discipline McAdams for the blog. Abbate also asserted she had been "the target of harassing emails, sent by [McAdams'] followers," although as of the date of that statement, Abbate had only received a single email critical of her. Two weeks later, Abbate threatened to sue Marquette and subject it to adverse publicity, unless the University acceded to her demands that the University fire McAdams, punish J.D., and pay "reparations" to her.[25]

¶127 J.D. and Abbate each shared their respective sides of the story with online news sources——J.D. with College Fix[26] and Abbate with the Daily Nous.[27] Other news sources picked up the story and it became national news.[28] After the story went viral, Abbate received numerous emails, some in support, some critical, and others vile and threatening.

---

[25] A short time later, Abbate left Marquette for University of Colorado.

[26] Matt Lamb, Student told he can't openly disagree with gay marriage in class at Jesuit college, The C. Fix (Nov. 17, 2014), http://www.thecollegefix.com/post/20138/.

[27] Justin Weinberg, Philosophy Grad Student Target of Political Smear Campaign, Daily Nous (Nov. 18, 2014), http://dailynous.com/2014/11/18/philosophy-grad-student-target-of-political-smear-campaign/.

[28] See, e.g., Colleen Flaherty, Ethics Lesson, Inside Higher Ed (Nov. 20, 2014), https://www.insidehighered.com/news/2014/11/20/marquette-u-grad-student-shes-being-targeted-after-ending-class-discussion-gay; Todd Starnes, Teacher to student: If you don't support gay marriage, drop my class, Fox News: Opinions (Nov. 22, 2014), http://www.foxnews.com/opinion/2014/11/22/teacher-to-student-if-dont-support-gay-marriage-drop-my-class.html.

¶128 Marquette found itself embroiled in a controversy it did not initiate. In response, it suspended McAdams from teaching, banished him from campus, and initiated disciplinary proceedings against him. After hearings, the Faculty Hearing Committee (FHC) recommended McAdams be suspended without pay. Marquette's President, Michael Lovell, accepted the FHC's recommendation but as a condition of reinstatement as a member of the faculty, demanded McAdams express his "deep regret"——a proviso reminiscent of forced confessions of guilt for imaginary crimes in oppressive regimes. Instead of abiding by its contract, which guaranteed academic freedom, Marquette breached it. As the court correctly holds, McAdams' blog post plainly falls within the definition of academic freedom under McAdams' contract.

¶129 Marquette subjected a tenured professor to discipline for writing something that triggered an adverse response from third parties over whom he has no control, thereby holding McAdams responsible for the actions of third parties. Allowing this retribution to stand would set a dangerous precedent, leading faculty to self-censor for fear of third-party reactions to speech and post hoc disapproval of it. If universities impose culpability on professors for the actions of others, it will undoubtedly cause the same chilling effect and result in the same stifling of expression that led the Supreme Court to strike down the legal imposition of "not-a-communist" promises, loyalty pledges, and disclosures of association in Keyishian,

20

Weiman, and Shelton, respectively. And academic freedom would be severely wounded, perhaps fatally.

VI

¶130 "*And though all the winds of doctrine were let loose to play upon the earth, so Truth be in the field, we do injuriously by licensing and prohibiting to misdoubt her strength. Let her and Falsehood grapple; who ever knew Truth put to the worse, in a free and open encounter.*" John Milton, Areopagitica 166-67 (James Russell Lowell ed., 1890) (1644).

¶131 Academic freedom is deeply entrenched in the history of this country and its college campuses. Universities are unique places for intellectual growth, where both students and professors can "follow truth wherever it may lead." Those who engage in the pursuit of truth, who propound ideas and challenge others, must enjoy the freedom to speak on matters of public concern without the sword of Damocles menacing their discourse.

¶132 "Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society." Sweezy, 354 U.S. at 251. Suppression of viewpoints confronting the current cultural orthodoxy would surely lead to academic stagnation and imperil the future of America. If institutional silencing of non-majority viewpoints replaces the search for truth, higher education becomes nothing more than an echo chamber of familiar and recycled perspectives, and the dialectic dies with it.

¶133 The court ensures the dialectic is alive and well in Wisconsin, and academic freedom along with it. I join the majority opinion in full.

¶134 DANIEL KELLY, J. *(concurring).* I offer this brief concurrence because I believe that not only was the FHC compositionally biased, the University's Discipline Procedure is itself structurally biased. The FHC cannot be considered impartial because, even though it was hearing the case, it was also one of the contending parties: The FHC is the University inasmuch as it is composed entirely of University employees. Faculty Statutes § 307.07(6). But it was not just the FHC——everyone in the disciplinary process was a University employee. Thus, the University (by its designated prosecutor[1]) presented its case to the University (in the form of the FHC[2]), which then made a recommendation to the University (in the person of President Michael Lovell[3]). We have long known the problems attendant upon allowing a party to decide its own case:

> No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity. With equal, nay with greater reason, a body of men, are unfit to be both judges and parties, at the same time; . . . .

The Federalist No. 10, at 59 (James Madison) (Jacob Cooke ed., 1961). Echoing Madison, the United States Supreme Court has said that "no man can be a judge in his own case[,] and no man

---

[1] See Faculty Statute § 307.07(11) (stating the "Administration may appear or be represented by its legal counsel"). At the hearing, the University appeared by two attorneys.

[2] See Faculty Statute § 307.07(1).

[3] See Faculty Statutes § 307.07(18)-(19); Faculty Handbook art. 4, § 1.01.1(1).

1

is permitted to try cases where he has an interest in the outcome." In re Murchison, 349 U.S. 133, 136 (1955).

¶135 And yet, the University tells us we are to defer to its determination that it did not breach its contract with Dr. McAdams. That proposition threatens the very concept of contract. A contract is supposed to bind the parties to ascertainable obligations. Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996) ("[A] contract must be definite as to the parties' basic commitments and obligations."). But if in a contract between Mr. Smith and Mr. Brown, Mr. Smith is the unreviewable judge of whether he has himself breached the contract, then his contractual obligations mean nothing but what he wishes them to mean. That, of course, is no contract at all.

¶136 I am not the only one to notice how this type of structural bias can turn tenure into employment-at-will. The D.C. Circuit in McConnell v. Howard University, 818 F.2d 58 (D.C. Cir. 1987), recognized the incongruity of casting a university as the unreviewable judge of its dispute with one of its faculty members. "If we were to adopt a view limiting judicial review over the substance of the Board of Trustees' decision, we would be allowing one of the parties to the contract to determine whether the contract had been breached." Id. at 68. I agree with McConnell that it "would make no sense for a court blindly to defer to a university's interpretation of a tenure contract to which it is an interested party." Id. at

2

69. Doing so "would make a sham of the parties' contractual tenure arrangement." Id. at 68.

¶137 I am authorized to state that REBECCA GRASSL BRADLEY joins this concurrence.

¶138 ANN WALSH BRADLEY, J. *(dissenting).* At its core, academic freedom is a professional principle, not merely a legal construct.[1] It embraces the academic freedom of the faculty as well as the academic freedom of the institution. "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself." Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 226 n.12 (1985) (internal citations omitted).

¶139 Within academic freedom lies the concept of shared governance. It includes the right of faculty to participate in the governance of the institution on academic-related matters. Shared governance in colleges and universities has been forged over decades to address the specific issues that arise in the workplace of higher education.

¶140 The majority errs in conducting only half of the academic freedom analysis. It fails to recognize, much less analyze, the academic freedom of Marquette as a private, Catholic, Jesuit university. As a result, it dilutes a private educational institution's autonomy to make its own academic decisions in fulfillment of its unique mission.

---

[1] Rachel B. Levinson, Academic Freedom, Shared Governance, and the First Amendment after Garcetti v. Ceballos, Stetson University College of Law, 31st Annual National Conference on Law and Higher Education 2 (Feb. 2011), https://www.aaup.org/NR/rdonlyres/4C126513-1194-4317-8123-459BD9F30A6D/0/Stetson2011AcadFreedomFirstAmdmtoutline.pdf.

1

¶141 Further, the majority compounds this error by rendering meaningless a key component of shared governance, reducing the faculty's bargained-for role in reviewing dismissal for cause to "nothing" or a mere "distraction." In disregarding the faculty hearing committee's expertise and unanimous recommendation, it throws aside a process that is mutually agreed upon and time-honored. Apparently, the majority thinks it is in a better position to address concerns of academic freedom than a group of tenured faculty members who live the doctrine every day.

¶142 Additionally, the majority conducts its analysis with a selective view of the facts. Missing from its opinion are key facts that informed McAdams' action. After publishing the blog post, McAdams actively promoted it to local and national media outlets. The record reflects that McAdams did so by "distributing copies of the audio recording to interested journalists and bloggers, posting follow-up stories linking back to the Nov. 9 post, creating a category of posts linked to Abbate by name, and arranging to appear on radio and television interviews about the story and subsequent controversy." McAdams wrote that he was aware that "'[w]hen one does something that gets national publicity, some jerks are going to say nasty things."

¶143 That prophecy was fulfilled here. Within hours of the blog post, Abbate started receiving negative emails, which only multiplied in the following weeks. She feared for her safety at Marquette and within weeks withdrew her dissertation proposal

and transferred to another university despite adverse consequences to her academic progress.

¶144 The travesty of the majority opinion lies not just in its decision for Marquette University. Because Marquette has adopted a definition of academic freedom and uniform procedures that have been embraced by many other colleges and universities, the decision is far reaching. The majority's decision to so readily discard institutional academic freedom and to disrespect part of the time-honored and bargained-for shared governance procedures will reverberate throughout this state.

¶145 Finally, because I determine that the doctrine of academic freedom does not protect McAdams from discipline, I address his argument that the First Amendment does. McAdams is wrong. His contract does not give him the full-throated First Amendment rights that would be given a private citizen vis-à-vis the government.

¶146 Accordingly, I respectfully dissent.

I

¶147 The majority errs first by curbing its discussion of academic freedom. It takes an expansive view of McAdams' academic freedom, but does not pay any mind to the academic freedom of the university.

¶148 "Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself[.]" Ewing, 474 U.S. at 226 n.12 (internal citations omitted). The term "academic freedom" is used to denote both

3

the freedom of the academic institution to pursue its ends without interference from the government, as well as the freedom of the individual teacher to pursue desired ends without interference from the institution.[2] <u>Piarowski v. Illinois Cmty.</u>

---

[2] The definition of academic freedom in Marquette's faculty handbook focuses on this second type of academic freedom, "[p]rofessorial academic freedom," or "that proper to the scholar-teacher." Marquette University, Handbook for Full-Time Faculty, "Rights and Responsibilities" 47 (version approved Aug. 27, 2013, last amended Nov. 13, 2017), http://www.marquette.edu/provost/_includes/documents/Facultyhand booklastupdatedMay82018numbered.pdf. Marquette's definition of academic freedom follows closely that of the AAUP's 1940 Statement of Principles on Academic Freedom and Tenure. Marquette's definition provides in relevant part:

> Academic freedom is prized as essential to Marquette University and to its living growth as a university. Professorial academic freedom is that proper to the scholar-teacher, whose profession is to increase knowledge in himself/herself and in others. As proper to the scholar-teacher, academic freedom is grounded on competence and integrity.
>
> When scholar-teachers carry on their academic lives in educational institutions, integrity requires both respect for the objectives of the institution in which they choose to carry on their academic lives and attention to the task of reevaluating these objectives as a necessary condition of living growth in human institutions.
>
> The University, because it prizes academic freedom, proposes the following safeguards to that freedom:
>
> . . .
>
>> c.     The college or university teacher is a citizen, a member of a learned profession, and an officer of an educational institution. When he/she speaks or writes as a citizen, he/she should be free from institutional censorship or discipline, but his/her special position in the civil community imposes special obligations. As

(continued)

4

Coll. Dist. 515, 759 F.2d 625, 629 (7th Cir. 1985) (citations omitted); see also Feldman v. Ho, 171 F.3d 494, 495 (7th Cir. 1999); J. Peter Byrne, Academic Freedom: A "Special Concern of the First Amendment", 99 Yale L.J. 251 (1989).

¶149 To manifest this freedom to pursue their ends, educational institutions set their own missions. As a Catholic, Jesuit institution, Marquette University operates according to certain guiding values. These values include the "holistic development of students" and a "commitment to the Jesuit tradition and Catholic social teaching."[3] It is also a guiding value of the institution to foster "vigorous yet respectful debate."

¶150 Marquette's status as a Jesuit institution is a cornerstone of its identity. According to amicus Association of Jesuit Colleges and Universities: "Being 'Catholic, Jesuit universities' is not simply one characteristic among others but is [their] defining character, what makes [them] to be uniquely

---

> a man/woman of learning and an educational officer, he/she should remember that the public may judge his/her profession and institution by his/her utterances. Hence, he/she should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he/she is not an institutional spokesperson.

Id.

[3] See Marquette University, http://www.marquette.edu/about/mission.php (last visited June 22, 2018).

5

what [they] are. . . . As <u>Jesuit</u> colleges and universities, [they] are a continuation of the Ignatian heritage and of the distinctive tradition of Jesuit education."

¶151 Jesuit institutions operate under the "Ignatian pedagogy." This educational philosophy encourages faculty to consider the "context" of the individual students in the classroom and "uniquely characterizes the relationship the faculty member has with the student [with whom] he [or] she attempts to create a teaching/learning environment."[4]

¶152 Private institutional learning environments present unique concerns and a particular need for independence in decision making. If the founding principles of each individual university are to be given life, the institution must possess the freedom to determine the consistency or inconsistency of actions with those principles.

¶153 Institutional academic freedom is inclusive of four "essential freedoms": "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." <u>Sweezy v. State of N.H. by Wyman</u>, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring). Although no court has clearly defined the scope of institutional academic freedom, McAdams' conduct and the faculty hearing committee procedures at issue in this case appear to

---

[4] Dr. Susan Mountin, <u>What is Ignatian Pedagogy?</u>, Marquette University Explore Series, http://www.marquette.edu/mission/IgnatianPedagogy.php (last visited June 25, 2018).

6

implicate the first of these "essential freedoms": who may teach. Although also relevant to public universities, this concern is especially germane in the context of private universities.

¶154 In determining who may teach at its university, Marquette has academic freedom to uphold its values and principles. It has academic freedom to provide an educational environment that is consistent with its mission as a university.

¶155 McAdams' appeal focuses on his individual rights, and the majority follows suit. However, McAdams' rights to academic freedom are not the only rights at issue.[5] An educational institution, here a private, Catholic, Jesuit institution, possesses the academic freedom to operate in accordance with its principles as long as it does not violate governing laws.[6] Such a right should be given some consideration, rather than the silent treatment the majority offers.

---

[5] See J. Peter Byrne, Academic Freedom: A "Special Concern of the First Amendment", 99 Yale L.J. 251 (1989) (explaining that institutional autonomy is a key facet of academic freedom); David M. Rabban, A Functional Analysis of "Individual" and "Institutional" Academic Freedom Under the First Amendment, 53 Law & Contemp. Probs. 227, 256 (1990), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=4057&context=lcp; Donna R. Euben, Academic Freedom of Individual Professors and Higher Education Institutions: The Current Legal Landscape, American Association of University Professors 6 (May 2002), https://www.aaup.org/sites/default/files/files/Academic%20Freedom%20-%20Whose%20Right%20(WEBSITE%20COPY)_6-26-02.pdf.

[6] See, e.g., Powell v. Syracuse Univ., 580 F.2d 1150, 1154 (2d Cir. 1978) (explaining that institutional academic freedom does not embrace the freedom to discriminate).

II

¶156 Within the concept of academic freedom lies the right of faculty to participate in the governance of the institution in academic-related matters. The majority errs next in jettisoning the shared governance of colleges and universities that has been forged over decades to address the specific issues that arise in this unique workplace. In the majority's view, the work of the faculty hearing committee (FHC) is of no import. It instead serves as a mere "distraction": "all of the time, energy, and resources that went into the Discipline Procedure and the richly-detailed Report are distractions from the necessary focus of our analysis." Majority op., ¶46.

¶157 Further, the majority doubles down on this assertion, overtly stating that the FHC's work represents nothing of substance: "As far as the Faculty Statutes and Faculty Handbook are concerned, the president may proceed as if the Report said nothing but that the FHC had completed the Discipline Procedure." Id., ¶49. It deems the work of the FHC not relevant and even raises the specter that perhaps the university need not have convened the FHC at all. See id., ¶47 n.16. Each of these conclusions ignores the context in which this dispute arises. Such analysis renders the concept of shared governance merely illusory and completely removes faculty input from these important decisions.

¶158 As observed above, the university has a strong interest in its own academic freedom to make autonomous

8

decisions. It exercises that academic freedom through the manifestation of the framework of shared governance.[7]

¶159 "Shared governance" allows university faculty to play a role in decisions that affect the academic mission of the university. The American Association of University Professors (AAUP) has extensively considered and set forth principles of shared governance in guidance documents. In 1940, it issued a Statement of Principles on Academic Freedom and Tenure, and in the decades that followed, it further refined the foundational principles therein.[8] The principles adduced by the AAUP are well recognized and have been widely adopted throughout higher education.[9]

¶160 Faculty participation in decisions regarding curriculum, tenure, and other academic-related matters is

---

[7] See Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury, 545 F.3d 4, 15 (D.C. Cir. 2008) (Edwards, J., concurring); Judith Areen, Government as Educator: A New Understanding of First Amendment Protection of Academic Freedom and Governance, 97 Geo. L.J. 945, 953-66 (2009).

[8] The 1940 Statement had its genesis much earlier, in 1915, when the AAUP's Committee on Academic Freedom and Academic Tenure formulated a "Declaration of Principles." In 1970, "interpretive comments" were added to the 1940 Statement clarifying certain statements and illuminating the intent of others.

[9] See Aaron Nisenson, Faculty Rights in the Classroom, Academe, Sept.-Oct. 2017, at 10, https://www.aaup.org/article/faculty-rights-classroom#.WykylGrwZhE ("[M]any colleges and universities have adopted, either in whole or in substantial part, AAUP policies on academic freedom, tenure, and governance in faculty handbooks, faculty contracts, or collective bargaining agreements.").

9

essential to the operation of the university. As the Marquette Academic Senate put it in its amicus brief to this court, "[s]hared governance includes, as a necessary component, prior faculty review of any attempt by the University administration to override the protections of tenure and dismiss or suspend a tenured faculty member."

¶161 AAUP's guidance documents include recommended procedural protections for faculty members. These procedural protections require that any proposed suspension or dismissal of a tenured faculty member come before an independent faculty committee for review prior to any adverse employment action. Marquette adopted a statutory procedure consistent with the AAUP's recommended methodology, which sets forth procedures for contested suspensions or terminations.[10]

¶162 The independent committee called for in the AAUP's guidance documents manifest in Marquette's case as the FHC. It is made up of tenured faculty members elected to serve three-year terms. In accordance with the adopted procedure, the FHC serves as an advisory body tasked with scheduling a hearing, determining the existence of cause, and making findings of fact and conclusions.

---

[10] See Marquette University Statutes on Faculty Appointment, Promotion and Tenure § 307.07, http://www.marquette.edu/provost/_includes/documents/Facultyhand booklastupdatedMay82018numbered.pdf.; compare American Association of University Professors, Recommended Institutional Regulations on Academic Freedom and Tenure 79, 83-84, https://www.aaup.org/file/RIR%202014.pdf (last visited June 25, 2018).

¶163 Under the majority's analysis, the FHC proceedings are rendered completely unnecessary.[11] It is the President who makes the decision as to discipline, the majority states, so there is no product of the FHC to which a court can defer. This treatment of the FHC ignores its role within the shared governance structure of the university.[12]

¶164 The FHC is a mutually agreed-upon dispute resolution mechanism. It is composed of Marquette faculty members who signed contracts similar to McAdams' and whose employment relationships are governed by the same faculty statutes. In other words, the members of the FHC live and breathe academic freedom and are in a position to say what the intent of the

---

[11] The majority accuses this dissent of proffering a "formless notion of what shared governance ought to be" rather than grounding its interpretation in the language of the Faculty Statutes. See majority op., ¶58. I acknowledge that the Faculty Statutes define the FHC as an "advisory" board. Faculty Statute § 307.07(1). However, the faculty statutes also include the bargained-for procedural safeguards giving the faculty the imperative to weigh in prior to any adverse employment action. See Faculty Statute § 307.07. The "form" of shared governance is provided by these procedural safeguards, which the majority discards as a "distraction."

[12] The majority exhorts that this dissent would end the University's "carefully balanced shared governance" by "turning a cooperative relationship into an adversarial contest." See majority op., ¶89. But the facts of this case fail to bear this out. Indeed, in this case the faculty, who the majority indicates "tries to expand its own sphere of academic freedom at the expense of the other," unanimously determined that McAdams' conduct was unprotected. Id.

parties was in signing a contract guaranteeing "academic freedom."[13]

¶165 Indeed here, the FHC was composed of seven tenured members of the faculty, chaired by a law professor, and was observed by a representative of the AAUP. After receiving evidence over the course of four days, the FHC unanimously found that there was clear and convincing evidence that Marquette had "discretionary cause" to impose discipline.[14] Accordingly, the FHC recommended that Marquette University President Michael Lovell impose a paid suspension of up to two semesters. Consistent with the FHC's recommendation, President Lovell imposed upon McAdams a two-semester suspension.

---

[13] I also observe that professors like those who make up the FHC are likely to support a robust academic freedom doctrine. The members of the FHC are not only sitting in judgment of a colleague, but interpreting the rules that govern themselves. It is telling that this group of people unanimously arrived at the conclusion that McAdams' conduct crossed the line.

[14] Marquette University Statute on Faculty Appointment, Promotion and Tenure § 306.03 defines "discretionary cause" as inclusive of:

> [T]hose circumstances, exclusive of absolute cause, which arise from a faculty member's conduct and which clearly and substantially fail to meet the standard of personal and professional excellence which generally characterizes University faculties, but only if through this conduct a faculty member's value will probably be substantially impaired. Examples of conduct that substantially impair the value or utility of a faculty member are: serious instances of illegal, immoral, dishonorable, irresponsible, or incompetent conduct. In no case, however, shall discretionary cause be interpreted so as to impair the full and free enjoyment of legitimate personal or academic freedoms of thought, doctrine, discourse, association, advocacy, or action.

12

¶166 The United States Supreme Court has directed that "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." Ewing, 474 U.S. at 225. It made this pronouncement with respect to a faculty decision that it characterized as "made conscientiously and with careful deliberation." Id. We can realize the Supreme Court's command by affording the respect due to the FHC's expertise and specialized knowledge.

¶167 With regard to the FHC's factual findings, "great respect" is surely appropriate. The FHC heard four days of evidence and produced a detailed 123-page report that was clearly "made conscientiously and with careful deliberation." See id.

¶168 It is the FHC, and not this court, that observed the demeanor of witnesses and is in a position to assess credibility. Deference to circuit courts' factual findings is appropriate in similar circumstances. Welytok v. Ziolkowski, 2008 WI App 67, ¶28, 312 Wis. 2d 435, 752 N.W.2d 359 (citation omitted) (explaining that "such deference is appropriate because the court has the opportunity to observe firsthand the demeanor of the witnesses and gauge the persuasiveness of their testimony").

¶169 Other jurisdictions have echoed this approach, and realize the Supreme Court's exhortation of "great respect" by affording deference to the conclusions of faculty hearing committees. For example, in Yackshaw v. John Carroll University

13

Board of Trustees, 624 N.E.2d 225, 225-27 (Ohio Ct. App. 1993), the Ohio court of appeals reviewed a similar breach of contract case involving a private university's hearing committee. The Yackshaw court found "rationale and guidance from the standard of review adopted by administrative agencies, especially when the involved parties have bound themselves contractually." Id. at 228.

¶170 Such "great respect" makes particular sense in the context of a private, Catholic, Jesuit institution with a distinct mission like Marquette. Indeed, in Murphy v. Duquesne University of the Holy Ghost, 777 A.2d 418, 433 (Pa. 2001), the Pennsylvania Supreme Court further explained the rationale for its determination that a faculty hearing procedure like that at issue here was an exclusive procedure. The Murphy court observed that Duquesne, like Marquette, is a private, Catholic university with a particular mission:

> The University is an ecumenically-based institution dedicated to promoting through the members of its tenured faculty the ethical and religious values of the "Judaeo-Christian tradition in its Catholic dimension." It comes as no surprise that the University and its faculty agreed not to cede to any lay outsider or secular institution the right to define and determine what behavior on the part of a faculty member was so antithetical to its mission that he could not remain a member of the University's community, and instead, concurred that the process set out in the Contract would finally decide whether a faculty member's actions rose to the level of serious misconduct and whether forfeiture was in order.

Id. at 433.

¶171 Here, it is also the faculty that is in the best position to determine "what behavior on the part of a faculty

14

member [is] so antithetical to its mission that he could not remain a member of the University's community." See id. The faculty unanimously determined that McAdams exhibited such behavior that violates the norms of the academic profession so as to call into question his fitness as a member of the university community.  As President Lovell observed in his letter to McAdams, a unanimous decision in the context of academia is no small feat:  "Getting a diverse group of faculty to unanimously agree on any topic can be difficult, so to have seven of your peers uniformly condemn and characterize your actions as egregious sends a strong message to my office and to the broader Marquette community."

¶172 By refusing to afford "great respect" to President Lovell's reliance on the unanimous faculty determination, the court as the third branch of government inserts itself into the fray.  Such an exercise is antithetical to the freedom of the academic institution to pursue its ends without interference from the government.

¶173 Rather than properly according the respect due to President Lovell's reliance on the FHC's findings and conclusions, the majority opinion renders meaningless a key part of shared governance, reducing the faculty's role in this decisionmaking to nothing.  It disregards the FHC's expertise, throwing aside a process that is mutually agreed-upon and time-honored.

III

¶174 The majority errs third by disregarding significant facts in its analysis. It concludes that McAdams' blog post cannot be the basis for discipline because the posting was a legitimate exercise of McAdams' academic freedom. Majority op., ¶84. In the majority's view, "the blog post has nothing relevant to say about Dr. McAdams' fitness as a professor." Id., ¶73. It further determines that "[j]ust because vile commentary followed the blog post does not mean the blog post instigated or invited the vileness." Id., ¶76. The majority misframes the issue.

¶175 In his letter to McAdams informing him of the disciplinary action taken, President Lovell is clear that it was not the views expressed in the blog post that led to discipline: "I think it is important to state that the sanctions being brought against you are solely based on your ACTIONS as a tenured faculty member at Marquette University, and have nothing to do with the political or ideological views expressed in your blog" (capitalization in original). President Lovell's letter thus makes clear that McAdams was disciplined for his actions, and not the blog post's viewpoint. Thus, the question is not "whether [the blog post's] contents remove the doctrine's protections." Id., ¶64. It is whether McAdams' actions are worthy of protection.

¶176 The majority recognizes that in engaging in extramural activities, a professor "occupies a 'special position in the civil community,' one that comes with 'special obligations.'"

16

Majority op., ¶65. Included in these "special obligations" is the duty to "exercise appropriate restraint." Id.

¶177 McAdams did not exercise any restraint at all, let alone appropriate restraint. I agree with the FHC that "where substantial harm is foreseeable, easily avoidable, and not justifiable, it violates a professor's obligations to fellow members of the Marquette community to proceed anyway, heedless of the consequences."

¶178 McAdams' actions were well summarized in President Lovell's discipline letter, where he approvingly quoted from the FHC report: "[McAdams'] use of a surreptitious recording, along with Ms. Abbate's name and contact information, to hold Ms. Abbate up for public contempt on his blog, recklessly exposed her to the foreseeable harm that she suffered due to Dr. McAdams's actions."

¶179 The majority unpersuasively asserts that the vile commentary immediately following the blog post "does not mean the blog post instigated or invited the vileness." Majority op., ¶76. The only way the majority can reach this conclusion is by ignoring significant facts in the record.[15]

---

[15] The record reflects that at the time of the events at issue in this case, Abbate was a graduate student in the philosophy department at Marquette. In addition to working on her dissertation, in the fall of 2014 Abbate taught two sections of Theory of Ethics, a philosophy class for undergraduates. I observe that throughout its opinion, the majority cherry-picks facts when it refers to Abbate as an "instructor" and not a "student." See, e.g., majority op., ¶1. In doing so, it colors the facts, disregarding the realities of the power dynamics at play here between a tenured professor and a graduate student.

17

¶180 First, McAdams knew the effect his blog post would have on Abbate. Among the FHC's factual findings that go unmentioned by the majority is that Dr. McAdams wrote in a blog post that "[w]hen one does something that gets national publicity, some jerks are going to say nasty things," indicating he was well aware of this modern media phenomenon. Indeed, that is exactly what happened here.

¶181 Shortly after the post's publication, Abbate began to receive hateful emails. The negative communications multiplied over the next several days, particularly after the incident received coverage on Fox News. She was forced to shut down her email account and remove her email address from Marquette's graduate student website.

¶182 Several of the communications Abbate received expressed violent and profane thoughts. She feared for her physical safety and experienced significant detrimental effects on her mental and physical health. A public safety officer was even posted outside Abbate's classes for two weeks.

¶183 Abbate ultimately withdrew from her dissertation proposal defense and transferred to another university. This transfer requires that she repeat three semesters of course work.

¶184 The majority further fails to mention that "Dr. McAdams purposefully omitted the name of a supporter of his blog from a comment he posted because 'the person was afraid of blowback or harassment.'" Why would McAdams do this if he was

18

blissfully unaware of the consequences of publishing a student's name, as the majority asserts?

¶185 Additionally, the FHC report demonstrates that McAdams has "on at least three occasions used the prospect of a mention on his blog as a threat." It indicates that McAdams threatened a Marquette student, the vice president for student affairs, a university provost, and a Dean that he would "raise hell" on his blog if they acted in a manner inconsistent with McAdams' wishes. McAdams pointedly told a Dean to "be careful" because "you don't want to be on my blog." Why would McAdams make such threats if he did not know what would happen to those whose names were published?

¶186 Also conveniently omitted from the majority opinion are any facts related to McAdams' active promotion of the blog post to local and national media outlets. After he made the blog post, McAdams actively promoted the story by distributing copies of the audio recording to interested journalists and bloggers, posting follow-up stories linking back to the post, creating a category of posts linked to Abbate by name, and arranging to appear on radio and television interviews about the story and subsequent controversy. He provided copies of the surreptitious recording to representatives of Fox News, Inside Higher Ed, and a local Fox television affiliate.

¶187 These omitted facts indicate that McAdams indeed did "instigate" or "invite" the vileness that followed his blog post. He knew what would happen, and he actively ensured that it would happen.

19

¶188 McAdams' actions certainly have something "relevant to say about Dr. McAdams' fitness as a professor." See majority op., ¶72. McAdams knew what he was doing, and, unfortunately for Abbate, the blog post had its intended effect. The revealing of a student's contact information for the purpose of holding that student up for public ridicule and harassment is not a protected act of academic freedom.[16]

IV

¶189 Because I determine that academic freedom does not save McAdams from the consequences of his actions, I also must address his argument that the First Amendment provides such salvation. I begin my examination of McAdams' argument by defining the parameters of the First Amendment protections to which McAdams is entitled.

¶190 "The [F]irst [A]mendment to the United States Constitution limits the actions of the federal and state governments. It provides no protection against action by private persons." Harman v. La Crosse Tribune, 117 Wis. 2d 448, 452, 344 N.W.2d 536 (Ct. App. 1984) (citation omitted); see also Hudgens v. NLRB, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is

---

[16] I also observe the potential effects of the majority opinion on the uninhibited exchange of ideas between faculty and students at Marquette. The direct effect of the majority's decision is to condone or acquiesce in professors' publicly subjecting students to ridicule and harassment. But it also sends an indirect message that may chill the exchange between faculty and students, lest they find themselves in the same position as Abbate.

20

a guarantee only against abridgement by government, federal or state.") (citation omitted).

¶191 Thus, as a private institution, Marquette's actions are not limited by the First Amendment. The First Amendment does not, without more, protect McAdams from discipline in his capacity as a professor at a private university.[17]

¶192 However, Marquette Faculty Statute § 307.07(2) provides that "[d]ismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights guaranteed them by the United States Constitution." McAdams contends that this language grants him a contractual right to free speech that "is coextensive with his right to freedom of expression under the First Amendment as a private citizen."[18]

---

[17] The First Amendment to the United States Constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ." Over the years, "Congress" has been defined as any government actor. See, e.g., Matal v. Tam, 582 U.S. __, 137 S. Ct. 1744, 1757 (2017) ("The First Amendment prohibits Congress and other government entities and actors from 'abridging the freedom of speech'").

[18] In his argument before the FHC, McAdams advanced a different interpretation of this language. He maintained that the provision was intended to give Marquette faculty members the same right vis-à-vis Marquette that government employees have under the First Amendment to their employers. Although neither party argues ambiguity here, it appears that such an argument could be made given the varied interpretation advanced by McAdams. The First Amendment rights of a private citizen are not coterminous with the First Amendment rights of an employee of a government employer. See, e.g., Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois, 391 U.S. 563, 568 (1968).

21

¶193 Of note in this discussion is the difference between the Marquette Faculty Statute and the AAUP's recommended institutional regulation on this subject. McAdams relies on language that is nonexistent, having been specifically removed from the Marquette Faculty Statute.

¶194 The AAUP recommends for inclusion in faculty contracts language stating that: "Dismissal will not be used to restrain faculty members in the exercise of academic freedom or other rights of American citizens."[19] Marquette's choice not to adopt the recommended "American citizens" language likely explains why McAdams' arguments before the FHC asserted rights not as a citizen but rather rights tantamount to those of an employee of a government employer.

¶195 He now changes course before this court, appearing to realize that the First Amendment rights of an employee of a government employer have been recognized as less than those afforded an American citizen. See, e.g., Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois, 391 U.S. 563, 568 (1968). Marquette's choice not to adopt the language also supports the argument that it did not intend that Faculty Statute § 307.07 afford to McAdams the contractual right to the full-throated First Amendment protections of a citizen.

---

[19] American Association of University Professors, Recommended Institutional Regulations on Academic Freedom and Tenure 79, 83, https://www.aaup.org/file/RIR%202014.pdf (last visited June 25, 2018).

22

¶196 Further, I agree with the FHC, the circuit court, and Marquette that McAdams' proffered interpretation leads to absurd results.  See Star Direct, Inc. v. Dal Pra, 2009 WI 76, ¶62, 319 Wis. 2d 274, 767 N.W.2d 898 (explaining that contracts are construed to avoid absurd results).  If it is indeed the case that the protections granted by Marquette Faculty Statute § 307.07 are "coextensive" with the rights afforded to private citizens under the First Amendment, McAdams would be free to teach virtually anything or nothing at all in his classes.  Marquette would be unable to discipline McAdams unless his speech fell into one of the few, narrow categories of speech that is not afforded First Amendment protections.[20]

¶197 McAdams asserts that this conclusion does not follow because conduct within the classroom is governed by the provisions on absolute cause set forth in his contract, and conduct amounting to absolute cause is not protected by the First Amendment.  But that is not what Faculty Statute § 307.07 says.  By its plain language, Faculty Statute § 307.07, applies equally to dismissals based on absolute or discretionary cause.[21]

---

[20] See, e.g., Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (speech intended and likely to incite imminent lawless action); Chaplinksy v. New Hampshire, 315 U.S. 568, 572 (1942) (fighting words).

[21] Marquette Faculty Statute § 307.07(2) provides in relevant part:

> A faculty member who has been awarded tenure at Marquette University may only be dismissed upon a showing of absolute or discretionary cause, as these terms are defined by the Handbook for Full-Time Faculty (hereinafter University Statutes), Section

(continued)

23

¶198 In fact, McAdams' interpretation of Faculty Statute § 307.07 would render Marquette's standards for absolute and discretionary cause meaningless. See Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶45, 326 Wis. 2d 300, 786 N.W.2d 15 ("When possible, contract language should be construed to give meaning to every word, 'avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.'"). Under McAdams' misreading, so long as some form of protected speech was involved, he could not be punished despite failing the tests for absolute or discretionary cause.

¶199 Accordingly, I conclude that neither academic freedom nor the First Amendment saves McAdams from the consequences of his reckless actions.

¶200 For the foregoing reasons, I respectfully dissent.

¶201 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

---

306.02 (absolute cause) or 306.03 (discretionary cause). Dismissal will not be used to restrain faculty members in their exercise of academic freedom or other rights guaranteed them by the United States Constitution.

24